David WAYFIELD, Plaintiff,

v.

TOWN OF TISBURY, et al., Defendant.

Civil A. No. 92–11461–RCL.

United States District Court,
D. Massachusetts.

May 21, 1996.

David Wayfield, Vineyard Haven, MA, pro se.

Regina M. Gilgun, Douglas I. Louison, Merrick and Louison, Boston, MA, for Defendant.

## OPINION

LINDSAY, District Judge.

This matter is before the court on the defendants' motion for summary judgment. The plaintiff, David Wayfield, has one remaining claim, others having been disposed of by the Court of Appeals for the First Circuit (*Wayfield v. Tisbury*, No. 93–1535, slip op., 1993 WL 487830 (1st Cir. Nov. 29, 1993)) or by an order of this court (*Wayfield v. Tisbury*, No. 92–11461, slip op. (D.Mass. Sept. 8, 1995)). Wayfield claims that officials of the Vineyard Haven Public Library in Tisbury, Massachusetts failed to afford him constitutionally-required due process when they suspended his library privileges without a hearing. The defendants, Marjorie Convery, director of the library, and the library trustees, assert that Wayfield has no liberty or property interest in access to the Vineyard Haven Public Library and that, for that reason, his due process claim must fail.

For the following reasons, the defendants' summary judgment motion on this claim is DENIED.

## I. Standard for Summary Judgment

Summary judgment is appropriate as to a claim or defense "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of establishing the lack of a genuine, material factual issue. *Snow v. Harnischfeger Corp.*, 12 F.3d 1154, 1157 (1st Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994) (*citing Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986)). It appears that there are no disputed material facts in this case. The question to be decided therefore is whether the defendants are entitled to judgment as a matter of law. The court concludes that they are not.

## II. Facts

Except where otherwise noted, the following facts are not disputed in this case, and where there are disputes about the facts, those disputed facts are not material to the disposition of the present motion.

Wayfield is an adherent of a movement called "historical revisionism." He believes that the Vineyard Haven Public Library "discriminates against [white] Christians in the use of its facilities and resources [and] plays down the holocaust of some 50 million Christians in the Soviet Union in Eastern Europe under Judeo–Communism and plays up the Jewish holocaust under the Third Reich." Amended Complaint, pars. 81, 82. For some time he has waged a campaign to expose "his neighbors and especially the children of Tisbury" to writers who espouse the doctrines of historical revisionism. Amended Complaint, par. 13.

On December 14, 1990, Wayfield went to the Vineyard Haven Public Library where he spoke to Convery in an attempt to persuade her to add to the library's collection several books and periodicals on historical revision-

ism. Wayfield says that sometime later that day—Convery says the next day—he was approached by Convery about a menorah that Convery thought was missing from the library. Convery questioned Wayfield insistently about the apparently missing menorah[1] and asked to inspect a shoulder bag Wayfield was carrying. Wayfield refused to permit his bag to be inspected. Wayfield's version of what happened is that Convery screamed at him, assaulted him, and tried to grab the shoulder bag. In any event, after the encounter with Convery, Wayfield left the library.

On December 18, 1990, Wayfield received a certified letter from Convery informing him that "[a]s a result of the disruptive incident that occurred on Saturday, December 15, 1990, in the Vineyard Haven Public Library and the disappearance of the menorah, your presence on the property or in the building will no longer be permitted." On December 20, 1990, Wayfield received another letter, this time from the library trustees, advising him that because of the "disruptive incident which occurred on Saturday afternoon, December 15, 1990," his library privileges were suspended until April 2, 1991. When Wayfield returned to the library in January, 1991, he was charged with trespassing. The trespassing charges were eventually dropped.

It does not appear from the record that in December, 1990 or January, 1991 the library had an established a policy for suspension of library privileges under circumstances like those presented in Wayfield's case.

### III. Discussion

■ Wayfield's claim is that, in depriving him of library access without affording him a hearing, the defendants deprived him of due process of law under the Fourteenth Amendment to the Constitution. The first step in determining whether a plaintiff has a due process claim is to identify a specific liberty or property interest affected by the alleged governmental action. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The next step, if a liberty or property interest has been affect-

ed, is to evaluate what process was due the plaintiff, and whether he was afforded it. *Id.; see also Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

In this case, Wayfield argues that he has a liberty or property interest in using the public library. He bases this argument on the library's public nature ("Public libraries are tax-supported institutions, municipal, public service corporations." Plaintiff's Brief on the Question of Due Process and Equal Protection ["Plaintiff's Brief"] at 1) and on his "liberty inherent in his classification of citizenship in the Commonwealth of Massachusetts." Plaintiff's Brief at 2. The defendants do not argue against this interpretation. They declare instead that "plaintiff's interest in attending the Vineyard Haven Public Library is neither recognized by state law nor is it a fundamental or natural right," Defendants' Supplemental Brief in Support of Their Motion for Summary Judgment ("Defendants' Supplemental Brief") at 3. They do not cite any cases to support that statement, and indeed they proceed upon the assumption *arguendo* that the court nevertheless has determined that a right to access to a public library exists.

### A. "Rights" Protected by Due Process

#### 1. Two Classes of "Rights"

■ "Rights" that merit due process protection under the Fourteenth Amendment may be either of two types. The first of these are those rights deemed "fundamental" or "natural." *Medina v. Rudman,* 545 F.2d 244, 249 (1st Cir.1976) (*citing Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The second encompasses rights recognized by state law as being common to all citizens; being so recognized they achieve the status of "liberty" or "property" interests when they are altered or extinguished. *Medina,* 545 F.2d at 250 (*citing Paul v. Davis,* 424 U.S. 693, 708, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976)).

---

1. As it turns out, the menorah was not missing from the library, but had been removed from its customary location and placed behind a shelf of books.

Rights in the first class, that is, "fundamental rights," are "chiefly those having to do with marriage, procreation, contraception, family relationships and child rearing and education," and "the rights created by other provisions of the Constitution." *Medina*, 545 F.2d at 250, n. 7 (*citing Paul*, 424 U.S. at 712–13, 96 S.Ct. at 1166). They also include "the right to earn a living and engage in one's chosen profession." *Medina*, 545 F.2d at 249 (*citing Schware*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)); *Meyer v. Nebraska*, 262 U.S. 390 (1923). Wayfield does not argue that his asserted liberty or property interest in using the library falls into these categories.

The second class of rights that merit due process protection comprises a much broader spectrum. Specifically, as noted above, it includes rights which have been recognized by state law and have thus become "liberty" or "property" for the purposes of the Fourteenth Amendment. The Supreme Court, in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), defined "property" as "an individual entitlement grounded in state law which cannot be removed except 'for cause.' " [2] *Id.* at 430 (*citing Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11–12, 98 S.Ct. 1554, 1561–62, 56 L.Ed.2d 30 (1978)); *Goss v. Lopez*, 419 U.S. 565, 573–74, 95 S.Ct. 729, 735–736, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). The Court went on to enunciate the breadth of possible "property" interests:

> Once that characteristic is found, the types of interests protected as "property" are varied and, as often as not, intangible,

relating "to the whole domain of social and economic fact." *National Mutual Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 646 [69 S.Ct. 1173, 1195, 93 L.Ed. 1556] (1949) (parallel citations omitted) (Frankfurter, J., dissenting); *Arnett v. Kennedy*, 416 U.S. 134, 207–208, [94 S.Ct. 1633, 1670–1671, 40 L.Ed.2d 15] (parallel citations omitted); *Board of Regents v. Roth*, 408 U.S. at 571–572, 576–577 [92 S.Ct. at 2706–2607, 2708–2709] (1972) (parallel citations omitted). *See, e.g., Barry v. Barchi*, 443 U.S. 55 [99 S.Ct. 2642, 61 L.Ed.2d 365] (1979) (parallel citations omitted) (horse trainer's license protected); *Memphis Light, Gas & Water Div. v. Craft*, [436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) ] (utility service); *Mathews v. Eldridge*, 424 U.S. 319, [96 S.Ct. 893, 47 L.Ed.2d 18] (1976) (parallel citations omitted) (disability benefits); *Goss v. Lopez*, [419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) ] (high school education); *Connell v. Higginbotham*, 403 U.S. 207, [91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (parallel citations omitted) (government employment); *Bell v. Burson*, 402 U.S. 535 [91 S.Ct. 1586, 29 L.Ed.2d 90] (1971) (parallel citations omitted) (driver's license); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (parallel citations omitted) (welfare benefits).

*Logan*, 455 U.S. at 430–31, 102 S.Ct. at 1154–55. To this list, the court added the right to use the Fair Employment Practices Act's adjudicatory procedures. *Logan*, 455 U.S. at 431, 102 S.Ct. at 1155.

The Court of Appeals for the First Circuit has found the following to be protected rights which cannot be denied without due process: a doctor's property right in his or her medi-

---

**2.** As for "liberty" in this context, the First Circuit has commented that, "[i]t has long been held that ... liberty encompasses much more than the simple right to be free from unwarranted bodily restraint." *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir.1973) (*citing Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)) (additional citations omitted). The court in *Raper* analogized that case (application for a driver's license) to a case in which a driver's license was suspended. The court found "the freedom to make use of one's own property, here a motor vehicle, as a means of getting about from place to place ... is a 'liberty' which under the Fourteenth Amendment cannot be denied or

curtailed by a state without due process of law." *Raper*, 488 F.2d at 752 (*quoting Wall v. King*, 206 F.2d 878, 882 (1st Cir.1953), *cert. denied*, 346 U.S. 915, 74 S.Ct. 275, 98 L.Ed. 411). Like the right at issue in *Wall*, the right claimed in *Raper* deserved the protection of due process. Wayfield does not specify whether the right he claims is a "property" or a "liberty" right. In any case, the difference between "liberty" and "property" is of no consequence in this context; the Supreme Court has said that the same test for determining the process due is applied whether liberty or property is at stake, *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

cal license, *Lowe v. Scott,* 959 F.2d 323 (1st Cir.1992); a previous court's finding that the plaintiff merited a license to operate a pool hall, *Roy v. City of Augusta,* 712 F.2d 1517 (1st Cir.1983); and the right to apply for a driver's license, *Raper v. Lucey,* 488 F.2d 748 (1st Cir.1973). By contrast, courts in this Circuit have found that the "right" to apply for a liquor license, *Grendel's Den, Inc. v. Goodwin,* 662 F.2d 88 (1st Cir.1981), *reh'g en banc,* 662 F.2d 102, and the "right" to be licensed to operate electronic game machines, *O'Neill v. Nantucket,* 545 F.Supp. 449 (D.Mass.1982), *aff'd,* 711 F.2d 469 (1st Cir. 1983), are not rights protected by the due process guarantee.

*2. Determining Whether the Right to Access to a Public Library is Recognized by State Law as a Right Common to All Citizens*

Under the analysis in *Logan,* the first inquiry is whether Wayfield has "an individual entitlement grounded in state law," *Logan,* 455 U.S. at 430, 102 S.Ct. at 1154. In this case, neither party has cited any state statute or local law or regulation governing the maintenance and use of the library. Nor has the court found any such state statute or local law or regulation. Recourse to an applicable statute or local law or regulation would help to resolve the issue of whether Wayfield has a protected liberty or property interest, because

> [t]he more narrowly drawn the statute or "the more circumscribed is the government's discretion (under substantive state or federal law) to withhold [the] benefit, the more likely that benefit constitutes 'property,' for the more reasonable is reliance upon its continued availability and the more likely it is that a hearing would illuminate the appropriateness of withholding it in an individual case."

*O'Neill,* 545 F.Supp. at 452 (*quoting Beitzell v. Jeffrey,* 643 F.2d 870, 874 (1st Cir.1981)). Most of the cases cited above include an analysis of a state or a local law which creates the plaintiff's alleged "right." In this case, the parties, as noted, have pointed to no such state or local law.

In the absence of a state statute or local law, the court is left to reason from governing caselaw. The First Circuit's opinion in *Medina v. Rudman,* 545 F.2d 244 (1st Cir. 1976), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977), provides an appropriate framework for analysis. *Medina* involved an application to participate in a greyhound-racing license. The court in that case, albeit tentatively, stated that

> A state-recognized interest might also exist if [the state] law could be said to confer upon [the plaintiff] a right, upon equal terms with others generally, to be licensed so as to engage in a common activity or pursuit.... [I]t seems likely that when a state holds out a right to citizens to engage in an activity on equal terms with others, a state-recognized status exists.

*Medina,* 545 F.2d at 250. This excerpt could describe the issuance of a library card and the privilege of using public libraries. Though this theory of due process rights has its genesis and finds its most frequent expression in cases construing rights affecting employment, *see, e.g., Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (application for bar examination); *Lowe v. Scott,* 959 F.2d 323 (1st Cir.1992) (medical license), the cited language from *Medina* does not specifically require that the "state-recognized interest" be related to employment. Indeed, the *Medina* court posited the "common activity or pursuit" rationale as a separate, independent reason for the Supreme Court's holding in *Schware.*[3]

The court in *Medina* distinguished the plaintiff's claimed "right" from the category described in the excerpt quoted above by pointing out that "racing licenses have not been viewed by the New Hampshire courts as open to all persons who meet prescribed standards. Rather they are treated as discretionary with the racing Commission." *Medina,* 545 F.2d at 250. Applying this

---

**3.** "The case of *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (parallel citations omitted), finding a right of due process with respect to bar admissions, can be explained on such a ground (as well as on the ground that the right to pursue an ordinary occupation is, by itself, a fundamental liberty interest ...)." *Medina,* 545 F.2d at 250.

distinction to Wayfield, the court is again disadvantaged by the lack of a state statute or local law (or even a policy statement) regarding the library's governing mechanisms. But it seems more likely that library access is intended to be "open to all persons who meet prescribed standards" (e.g., residency and minimum age) than that it is "treated as discretionary" by a supervisory board.

■ One final point: Wayfield argues that the *suspension* of his library privileges is an occurrence important enough to warrant due process protection. He is correct. There is a distinction in the caselaw between plaintiffs who are applying for licenses and those who seek to bar the suspension or revocation of their licenses. Plaintiffs in the latter class, the already-licensed, have a vested property interest in the license, which forecloses denial without due process. *Lowe v. Scott*, 959 F.2d 323 (1st Cir.1992) (medical license); *Roy v. City of Augusta*, 712 F.2d 1517 (1st Cir.1983) (license to operate pool hall); *Medina v. Rudman*, 545 F.2d at 250 ("Doubtless once a license, or the equivalent, is granted, a right or status recognized under state law would come into being, and the revocation of the license would require notice and hearing ..." *id.*): *Wall v. King*, 206 F.2d 878 (1st Cir.1953), *cert. denied* 346 U.S. 915, 74 S.Ct. 275, 98 L.Ed. 411 (driver's license). Cases finding that plaintiffs have a "liberty or property" interest in a previously-granted license have been the foundation for cases determining that plaintiffs have a "liberty or property" interest in *applying* for a license. See, e.g., *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (right to apply for bar examination); *Raper v. Lucey*, 488 F.2d 748 (1st Cir.1973) (right to apply for driver's license). Wayfield held library privileges, which were suspended. His case thus falls into the first category—cases in which the plaintiff already holds a license—a category in which the First Circuit has recognized, due process is required.

Thus, under the analysis set forth in *Medina* and related cases, this court finds that Wayfield states a sufficient claim to support a finding that the suspension of his access to the library was a deprivation of a "liberty or property right." The court must next determine whether Wayfield was afforded pre- or postdeprivation due process sufficient to satisfy the mandate of the Fourteenth Amendment.

*B. What Process is Due*

■ Wayfield's loss of his library privileges is only actionable under § 1983 if he was deprived of his liberty or property interest *without due process of law. Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 985, 108 L.Ed.2d 100 (1990) (*citing Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981)). Thus, the court must determine what process, if any, Wayfield was afforded, and whether that process was sufficient under the Fourteenth Amendment.

■ The inquiry into the nature of process due a person when his or her rights are curtailed is ordinarily governed by the familiar three-part balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). That test requires that the court consider:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.*, at 335, 96 S.Ct. at 903.

The Court in *Mathews*, retreating from the high-water mark of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),[4] found that so-called "predeprivation hearings" (hearings affording the person

---

**4.** In *Goldberg*, the Court held that recipients of welfare benefits were entitled to a hearing *before* those benefits were terminated.

whose liberty or property interest is at stake an opportunity to respond before any deprivation of rights is effected) are not necessary before every curtailment of a protected right. Instead, in some cases, a postdeprivation hearing affords sufficient process. Thus, the three-part test quoted above is used to determine whether the necessary safeguards were in place, and is appropriate regardless of when the "process" was afforded, or, in the words of the Supreme Court, when the plaintiff had "notice of the case ... and [the] opportunity to meet it," *Mathews,* 424 U.S. at 348, 96 S.Ct. at 909 (*quoting Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)).

The rule in *Mathews* has since been explained by the Supreme Court. Under later cases considering "postdeprivation" due process, it is clear that such due process is an exception, and not the rule. Specifically, it applies in cases in which the government officials who are alleged to have deprived the plaintiff of his or her rights are found not to have been acting in accordance with approved procedure. In these cases, when the "random and unauthorized acts" of a state actor result in a deprivation of property, the proper inquiry is that set forth in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In those situations

> the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing.

*Id.,* at 541, 101 S.Ct. at 1916. The *Parratt* Court went on to adopt the reasoning of Justice (then Judge) Stevens, writing for the Seventh Circuit in *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir.1975), *modified en banc,*

545 F.2d 565 (1976), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978) and distinguishing the actions of a state official, acting in accordance with state policies, from the actions of a renegade state official:

> ... there is an important difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers. In the former situation the facts satisfy the most literal reading of the Fourteenth amendment's prohibition against "State" deprivations of property; in the latter situation, however, even though there is action "under color of" state law sufficient to bring the amendment into play, the state action is not necessarily complete.

*Id.,* at 1319.

In *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), for example, the Court found that the plaintiff had a property right in his ability to sue his employer under the Fair Employment Practices Act. In that case, the state, which had negligently scheduled Logan's hearing after the 120–day limitations period, thus extinguishing Logan's right to his claim, was found to have abridged Logan's property right, in violation of the due process clause. *Logan,* 455 U.S. at 433, 102 S.Ct. at 1156. Despite the fact that Logan had a claim against the state Fair Employment Practices Commission under state tort law, the Court held that that postdeprivation process was not sufficient to deny Logan his constitutional claim. Such an argument, the Court said, "misses *Parratt*'s point." *Logan,* 455 U.S. at 435, 102 S.Ct. at 1157. In *Logan,* unlike in *Parratt,* the plaintiff was challenging the state procedure itself, not the unauthorized actions of a state official. The *Logan* Court made it clear that this distinction is critical to the evaluation of whether postdeprivation due process is sufficient, or whether predeprivation process is required.

In the case at bar, the difficulty comes in distinguishing on which side of this bright line the actions of the officials of the library fall. The defendants, in their moving papers, make no reference to any written or otherwise established procedure for the suspen-

sion of library privileges that existed at the time the officials of the library took action against Wayfield. Nor have the defendants proffered anything which shows what the library has done in other, similar situations, if indeed there have been any. On this state of the record, then, it is not clear whether the appropriate inquiry as to what process is due should take place under the more general test of *Mathews* or under the exception set forth in *Parratt.*

In evaluating which of these inquiries properly governs this case, the court is instructed by the warnings set forth in a more recent Supreme Court case, *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). As recognized by this Circuit's Court of Appeals, *Zinermon* refocused the inquiry on whether predeprivation process was feasible, and on the relative costs (both administrative/economic and costs to liberty or property rights) of having a predeprivation or a postdeprivation hearing. In that case, the plaintiff (Burch) was admitted to a mental institution as a "voluntary" patient. Burch "alleged that at the time of his admission he was in no condition to have executed forms indicating that his admission was voluntary" and should have been "afforded the protection of [the state's] involuntary admission procedure." *Lowe v. Scott,* 959 F.2d 323, 341 (1st Cir.1992) (*citing Zinermon,* 494 U.S. at 115, 110 S.Ct. at 977). Burch claimed the hospital officials had denied him due process by not employing the involuntary admission procedure. The hospital officials contended that the complaint "alleged that their conduct was random and unauthorized" and maintained that *Parratt* and a similar Supreme Court case, *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), "limited the procedural due process inquiry to the question of the adequacy of [the state's] postdeprivation remedies." *Lowe,* 959 F.2d at 341 (*citing Zinermon,* 494 U.S. at 115, 110 S.Ct. at 977). This argument is similar to the argument made by the defendants in the case at bar.

Applying *Zinermon,* the First Circuit, in *Lowe,* 959 F.2d at 341, said that *Zinermon,* "requires that courts scrutinize carefully the assertion by state officials that their conduct is 'random and unauthorized' within the meaning of *Parratt* and *Hudson,* where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state postdeprivation remedies." *Id.* Accordingly, this court, under the First Circuit's mandate, must be cautious about accepting the defendants' argument that their actions are covered by *Parratt,* and not by the general analysis of *Mathews.*

The First Circuit provides guidance for determining which inquiry is appropriate. In its analysis in *Lowe,* the First Circuit noted that, in *Zinermon,* there had been "three reasons for distinguishing *Parratt* and *Hudson,*" *Lowe,* 959 F.2d at 341. First, in *Zinermon,* it was "hardly 'unpredictable' or 'unforeseeable' that hospital officials would need to examine patients' competency prior to their admission to a mental hospital." *Id.* Thus, the state could be expected to be able to anticipate the deprivation at issue. Second, "the Court found that because the deprivation experienced by Burch could have been more easily anticipated than those of the prisoners in *Parratt* and *Hudson,* there was a greater likelihood that [the state] could have provided predeprivation process that would have averted Burch's improper admission." *Id.* Third, "because [the state] had delegated the hospital officials broad authority to 'effect the very deprivation complained of here,' their conduct could not be said to be 'unauthorized' in the same sense as the destruction of prisoners' property [in *Parratt* and *Hudson* ]." *Id.*

Applying this reasoning to the case at bar, Wayfield can make a colorable argument that (1) the deprivation he experienced was one that the state could be expected to anticipate (it does not require a leap of imagination to think that a patron's library privileges might be suspended); (2) the state could have provided predeprivation process (whether in the form of a warning letter and an opportunity to respond, or a hearing before the trustees, or in some other manner); and (3) that the state had delegated the library the authority to effect the deprivation, so their actions could not be said to be "unauthorized." Wayfield does not directly argue this point. However, because he is *pro se,* the court has

888

a duty to read his papers liberally. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Ayala v. Lebron,* 909 F.2d 8, 15 (1st Cir.1990).

The defendants' argument is that the "emergency" nature of the situation required such rapid action that postdeprivation process is all that can be required. To support this proposition, they cite a case in which city officials demolished the plaintiff's building without first consulting him. In that case, *Harris v. City of Akron,* 20 F.3d 1396 (6th Cir.1994), *cert. denied* — U.S. —, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994), the plaintiff's building was observed to be "dangerously close to falling onto [the street] and a neighboring occupied home." *Id.* at 1398. The city tried to call the building's owner, who was not in, and left an urgent message with his assistant. *Id.* Then, pursuant to an emergency provision in the city building code, the inspectors destroyed the building.

*Harris* is not relevant to the court's decision in this case. The facts are too far removed for any useful parallel to be drawn. In that case, the defendants acted in accordance with a municipal code; in Wayfield's case, there was no applicable code. Perhaps most importantly, in *Harris,* there was an actual, physical, immediate emergency; here, in contrast, Wayfield received the letters notifying him of the suspension of his library privileges some days after the "emergency" "disturbance" in question.

The defendants' argument that their position is analogous to that of the state actors in *Zar v. South Dakota Board of Examiners of Psychologists,* 976 F.2d 459 (8th Cir.1992) is likewise unavailing. The defendants in *Zar,* unlike the defendants in this case, failed to follow an applicable, written procedure. In that case, the defendant members of the Board of Examiners of Psychologists ("the Board") failed to implement an established procedure that would have allowed the plaintiff, Dr. Zar, to contest the Board's recommendation that his medical license be revoked. The court found that the actions fit within the *Parratt* framework, under the *Zinermon* test, because the state could not have known that its employees would act as

they did, since the state had promulgated rules which the defendants had ignored.

In light of the defendants' failure to make a persuasive argument that the *Parratt* inquiry properly applies to this case, and in light of the First Circuit's warning in *Lowe* to "scrutinize carefully the assertion by state officials that their conduct is 'random and unauthorized' within the meaning of *Parratt* and *Hudson,* where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state postdeprivation remedies," *Lowe,* 959 F.2d at 341, the court finds that the appropriate standard for deciding what process was due Wayfield is the familiar *Mathews v. Eldridge* standard.

Under that standard, the court must look first at the "private interest that will be affected by the official action." *Mathews,* 424 U.S. at 322, 96 S.Ct. at 901. In this case, that interest is significant; other courts have found that the ability to use a public library implicates important First Amendment rights. *See Kreimer v. Bureau of Police,* 958 F.2d 1242 (3d Cir.1992); *Brinkmeier v. City of Freeport,* 1993 WL 248201 (N.D.Ill. 1993) (plaintiff who had allegedly harassed library staff-member denied access to library; court finds First Amendment right of access to library and notes the absence of "formal procedure whereby a person may challenge his denial of access to the library" as evidence that "the policy is less than reasonable," *id.* at *6). Thus, Wayfield's claim passes the first prong of the *Mathews* test.

The second inquiry is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 321, 96 S.Ct. at 896. The record before the court indicates that Wayfield was afforded no predeprivation process. This fact, combined with the lack of standards or rules governing the suspension of library privileges, leads the court to believe that the risks of erroneous deprivation are great.

Finally, the court must consider the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substi-

tute procedural requirement would entail." *Mathews,* 424 U.S. at 321, 96 S.Ct. at 896. As noted above, the officials of the library could undertake a number of not particularly onerous prophylactic measures that would protect the due process rights of its patrons without significantly burdening the library. For example, the library could send a letter to patrons who were threatened with potential suspensions, notifying them of the action pending against them and inviting them to argue their cases, in writing or in person.

The court determines that, under the three-part analysis of *Mathews v. Eldridge,* the defendants did not afford Wayfield adequate due process. Indeed, it appears from the record in this case that they afforded him no process at all.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is DENIED. Given the nature and extent of this ruling, it may be appropriate for the court, *sua sponte,* to render summary judgment to Wayfield as to the liability of the defendants on his claim. The defendants, however, are entitled, before such a ruling is made, to notice and an opportunity to present evidence and argument as to why that ruling would be inappropriate. *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 134 (1st Cir.1979), *cert. denied sub nom Baird v. Pratt,* 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979). Accordingly, the court orders that the defendants file papers on or before June 10, 1996 setting forth their position as to the granting of summary judgment to Wayfield with respect to the defendants' liability on Wayfield's due process claim.

So ordered.