June ROTH, Plaintiff-Appellant,

v.

Nathan PRITIKIN and Patrick M. McGrady, Jr., Defendants-Appellees.

No. 1322, Docket 83–7013.

United States Court of Appeals, Second Circuit.

Argued June 2, 1983.

Decided June 20, 1983.

Certiorari Denied Nov. 7, 1983.

See 104 S.Ct. 394.

Charles Haydon, New York City (Dublirer, Haydon, Straci & Victor, New York City of counsel), for plaintiff-appellant.

Lawrence I. Weinstein, New York City (Milgrim, Thomajan, Jacobs & Lee, George L. Graff, New York City, of counsel), for defendant-appellee, Nathan Pritikin.

Roy J. Karlin, New York City (Shapiro, Shiff, Beilly, Rosenberg & Fox, Lewis Rosenberg, Stanley N. Albert, New York City,

of counsel), for defendant-appellee, Patrick M. McGrady, Jr.

John A. Crawford, III, New York City, for amicus curiae, Graphic Artists Guild, Inc.

Before KAUFMAN, PRATT, and GIBSON,* Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Contracting parties often discover they might have gained a more advantageous arrangement than their original bargain if they had the power of clairvoyance. Not infrequently, with the benefit of hindsight, one may come to believe the terms agreed upon at a time past, unfairly deprived him of the compensation which, because of later events, seems more appropriate.

In the dispute before us, June Roth created certain recipes which were incorporated into what proved to be a best-selling book. She now invokes the Copyright Act of 1978 to challenge a district judge's determination that she entered into a valid contract, accepting $3,000 as full compensation for her labors. The facts are important to the resolution of this issue, and accordingly, we set them forth in some detail.

I

In 1976, Patrick McGrady, a prominent medical writer and free-lance journalist, visited Nathan Pritikin's "Longevity Center" in Santa Barbara, California. The Center offered treatment, based upon Pritikin's diet and exercise plan, for persons suffering from a variety of physical afflictions. After spending almost one month at the clinic, McGrady was impressed with the program's apparent success, and in November 1976 wrote an article for *Woman's Day* magazine discussing Pritikin's nostrums.

McGrady's story sparked a great deal of interest in the publishing community. Accordingly, he received several inquiries urging him to write a book on the subject. In December 1976 McGrady and Pritikin entered into an agreement, pursuant to which

* Of the United States Court of Appeals for the     Eighth Circuit, sitting by designation.

McGrady was primarily responsible for writing the book. Pritikin would lend his name and expertise to the endeavor. Publication and distribution rights were sold to Grosset & Dunlap.

The authors realized their tome would benefit from the inclusion of recipes which would assist readers in adhering to the strict dietary requirements of the Pritikin regimen. Following several unsuccessful encounters with other authors in the Spring of 1977, McGrady approached June Roth, a free-lance writer, specializing in food and health matters. She had previously contributed to a number of cookbooks, and had written several articles on food-related topics. Roth agreed in principle to create the recipes, and McGrady provided her with a list of dietary specifications embodied in the Pritikin program.[1]

McGrady and Roth met on August 30, 1977 to discuss the details of Roth's participation in the endeavor. McGrady asked Roth what compensation she would require, suggesting a price of "several hundred dollars." Roth rejected this offer, and they compromised on a payment of either $1,500 in addition to a portion of the royalties from serialization rights, or, alternatively, a flat fee of $3,000. Roth disputes McGrady's account of the August 30 accord, asserting they agreed to a $3,000 advance on her share of the book's royalties.

On September 16, 1977 McGrady mailed Roth a letter acknowledging his version of the agreement. He stated Pritikin preferred a $3,000 flat fee, and asked her to respond "if this does not accord with your understanding." Several days later McGrady telephoned Roth and orally reconfirmed their arrangement. Roth disputes either of these communications was made.

In October 1977 Roth delivered her recipes. She received $3,100 for her labors. An initial check for $1,000 was dated November 11, 1977 and included a notation— "one-third payment for recipes." Two other checks for $1,100 and $1,000 were mailed in March 1978 and March 1979, respectively.

The book, *The Pritikin Program for Diet & Exercise,* was finally published in the Spring of 1979. It became an immediate success and remained on best-seller lists for a full 52 weeks. By the date of trial, Pritikin and McGrady had realized royalties in excess of $1,000,000, and, as one might expect, Roth's pride at the book's favorable reception was tempered by the realization that her financial reward was marginal. She complained to McGrady, and made several requests for additional compensation. Ultimately she refused McGrady's offer of payment of $2,000 beyond the sum she had already earned.

Roth finally filed suit in the Southern District of New York, asserting she had never entered into a valid contract concerning payment for her recipes, and alternatively, if any such agreement had been made, it was rendered invalid because of the subsequent enactment of the Copyright Act of 1978. The defendants answered, claiming she accepted $3,000 as full compensation.

A three-day bench trial was conducted in December 1982. After considering the testimony of the witnesses, including Roth, Pritikin, McGrady, Julian Bach (the literary agent) and others, and viewing the documentary materials submitted by the parties, Judge Griesa delivered an oral opinion. The district judge concluded Roth entered into a binding contract in August 1977, consenting to accept $3,000 in return for creating recipes. Accordingly, the district court determined Roth was a "writer for hire" with no interest in the copyright pursuant to the law extant at the time the agreement was executed. Finally, the

---

1. The list of foods prohibited by the Pritikin diet reads like the shopping list of a typical American family. Roth was directed to omit fats, high-fat foods, salt, whole milk products, cholesterol-rich items, sugars and many prepared foods and condiments from her recipes. Replacing these commonplace items were complex carbohydrates such as whole grains, vegetables and fruits. The emphasis of the regimen was on natural substances, cooked simply, often merely steamed. As one might imagine, one of the shortcomings of a diet plan based upon these strict requirements was the lack of variety in meals. Roth was charged with the difficult task of making the program palatable to the average American.

judge rejected Roth's claim that the 1978 Act applied retroactively and therefore invalidated the accord concerning Roth's participation in the book.

Roth appeals from the judgment entered on Judge Griesa's order, renewing her original assertions that there was no initially valid agreement, and in any event, that the subsequently enacted Copyright Act altered the rights and obligations of the parties and voided the compact. We find these claims of error to be without merit, and accordingly, we affirm the judgment.

## II

■ Roth's initial challenge may be disposed of briefly. Notwithstanding appellant's attempt to denigrate the district judge's findings of fact, his conclusion that she entered into a lawful contract was fully supported by the evidence adduced at trial, and there is no basis for rejecting it as clearly erroneous. *See* Fed.R.Civ.P. 52(a); *United States v. Yellow Cab Co.*, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949); *Stafford v. International Harvester Co.*, 668 F.2d 142 (2d Cir.1981).

McGrady's testimony concerning the oral agreement was corroborated by letters mailed to Pritikin discussing the terms of Roth's employment. In addition, the notation on the margin of Roth's first check indicated it was a one-third payment for her services, and appellant did not challenge the validity of this memorandum or attempt to clarify the perceived ambiguity in the terms of her arrangement with McGrady. Moreover, when pressed on cross-examination, Roth admitted there was no explicit statement by McGrady that the $3,000

represented an advance on royalties, but she merely "construed" their conversation as indicating this was the bargain reached.[2]

In sum, the evidence adduced at trial was inconsistent, and the judge was free to draw conclusions based upon his perception of the witnesses' credibility and demeanor. *Newman v. Local 1101, Communication Workers of America, A.F.L.–C.I.O.,* · 597 F.2d 833, 836 (2d Cir.1979). Roth has not met her burden of demonstrating the district court's findings were clearly erroneous, and accordingly, we must decline her invitation to reverse them.

## III

■ We now reach the core legal issue presented in this dispute. The parties agree that if the oral contract between Roth and McGrady is governed by the law in effect in 1977, it was proper, and divested appellant of any rights she might otherwise have possessed to a share of the publication's royalties.[3] The parties disagree, however, on the significance of the Copyright Act of 1978. Appellant asserts all copyrights are governed by the new Act, and accordingly, her rights as the author of a substantial portion of the book must be determined with reference to this statute. The appellees assert the 1978 Act has no impact upon agreements entered into prior to its effective date. Because we believe the Act's language, its legislative history, and generally applicable rules of statutory interpretation all mandate prospective application of the rules governing work for hire agreements, we reject appellant's contentions.

---

**2.** The judge's findings were also supported by the testimony of Julian Bach, a witness who had little stake in the outcome of the dispute. Bach stated he spoke with appellant on several occasions in 1980, and although she admitted she had no right to additional compensation, she asked whether Bach thought Pritikin and McGrady might grant her additional remuneration in view of the book's success. In addition, Bach noted a $3,000 fee was not, on the basis of his experience, an unusually meager stipend for a writer of Roth's stature.

**3.** Roth created the recipes at McGrady's request, *see Siegel v. National Periodical Publica-*

*tions, Inc.,* 508 F.2d 909 (2d Cir.1974), and Pritikin and McGrady retained the right to supervise her work and reject the meal plans at their discretion. *See Scherr v. Universal Match Corp.,* 417 F.2d 497, 500 (2d Cir.1969), *cert. denied,* 397 U.S. 936, 90 S.Ct. 945, 25 L.Ed.2d 116 (1970). In the absence of evidence to the contrary, ownership of the copyright would, accordingly, be presumed to lie with the "person at whose instance and expense the work [was] done." *Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565, 567 (2d Cir.1966); *see Yardley v. Houghton Mifflin Co.,* 108 F.2d 28 (2d Cir.1939), *cert. denied,* 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940).

Pursuant to the new statute, the creator of a "work for hire" has no ownership interest in a copyright. 17 U.S.C. § 201(b). That term is defined in the Act as

(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. Except for the requirement that the agreement be memorialized in a writing, this definition would clearly apply to Roth. As we have indicated, however, Roth's understanding with Pritikin and McGrady was not transcribed, and accordingly, she asserts her contribution should not be viewed as a work for hire.

Resolution of this issue, of course, depends on the Act's application to the present dispute. Roth contracted to furnish the recipes in 1977, prior to the statute's enactment. Appellant, however, asserts this date is of little moment, since in her view the Act applies retrospectively. She relies on Section 301:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [which] ... come within the subject matter of copyright as specified by sections 102 and 103, *whether created before or after that date* ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(emphasis supplied). The italicized language, Roth claims, demonstrates a clear congressional intent to apply the provisions of the 1978 Act to all copyrights in effect on the date of enactment.

■ Roth's interpretation of § 301, while imaginative, is wholly unsupported by the congressional intent, as indicated both by the terms of that provision and its legislative history. Fairly read, § 301 merely provides the rights accruing to the owner of a copyright, those "specified in section 106," are defined pursuant to the 1978 Act, rather than prior law. Whoever holds an interest in a copyright on or after January 1, 1978, has a right to the protections afforded by the new statute, although the creative work may previously have been governed by the 1909 Act or the common law. Section 301 does not, however, purport to determine who holds a copyright for works created before January 1978. It merely clarifies the rights of individuals owning copyrights on that date, whomever they may be.

Prior to the enactment of the 1978 Act, copyright interests in published works were controlled by the 1909 Copyright Act. Unpublished material enjoyed virtually perpetual protection under state common law. *See Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); *Meltzer v. Zoller,* 520 F.Supp. 847, 853 (D.N.J.1981). This dual system proved unwieldy, particularly in view of technological advances which diminished the importance of publication as the principal factor determining which body of law applied. Cognizant of these shortcomings in existing law, Congress passed the 1978 Act to implement a uniform system of copyright protection applicable to all creative works. The statutory language upon which Roth relies merely indicates that all copyrights, whether previously governed by the common law or by the 1909 Act, were thereafter to be controlled by the provisions of the 1978 statute.

The legislative history of § 301 makes clear a congressional intent to preempt previous law and replace the labyrinth of statutory and common law authority with a single, generally applicable federal statute.

Instead of a dual system of "common law copyright" for unpublished works and statutory copyright for published works, ... the bill adopts a single system of Federal statutory copyright from creation .... Common law copyright protection for works coming within the scope of the statute would be abrogated, and ... a single Federal system [would be substituted for] the present anachronistic,

uncertain, impractical, and highly complicated dual system.

H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 129 (1976), *reprinted in* [1976] U.S.Code Cong. & Ad.News 5659, 5745; *see also* H.R. Conf.Rep. No. 94–1733, 94th Cong.2d Sess. 78–79 (1976), *reprinted in* [1976] U.S.Code Cong. & Ad.News 5810, 5819–20.

Nothing in the House or Senate reports accompanying the proposed Copyright Act evinces an intention to have the work for hire provisions retroactively apply. The total absence of consideration of the issue by the drafters would be sufficient to undercut Roth's claim, for it is well-settled "that a retrospective application will not be given a statute ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' " *Union Pacific R.R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (citations omitted); *see United States v. Security Indus. Bank,* —— U.S. ——, ——, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982); *Green v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964).

Moreover, the Copyright Act, although passed by Congress on October 19, 1976, was not made effective until January, 1978. It would seem anomalous for the legislature to defer the effective date of the Act if it intended the statute, when implemented, to govern retrospectively. *See Ocean & Atmospheric Science, Inc. v. Smyth Van Lines, Inc.,* 446 F.Supp. 1158, 1159 (S.D.N.Y.1978).

Although the issue raised by Roth appears to be relatively novel, one Circuit Court has commented on the retroactivity of the work for hire standard, and has declined to adopt the position appellant urges this Court to accept. *May v. Morganelli-Heumann & Assoc.,* 618 F.2d 1363, 1368 n. 4 (9th Cir.1980). In addition, Professor Nimmer, a noted authority on copyright law, argues in his treatise that the 1978 Act does not affect the ownership rights of persons holding copyrights prior to January 1978. 3 *Nimmer on Copyright,* § 10.03[B][2] (1982) ("[I]t is necessary to determine the identity of the common law copyright owner upon such preemption date in order to determine who succeeded to statutory copyright ownership.")

■ Although the language of the Act, its legislative history and rules of statutory interpretation are sufficient answers to Roth's claim, we note, *en passant,* adoption of her interpretation of § 301 would, in addition, raise a serious issue concerning the Act's constitutionality. *See* 1 *Nimmer on Copyright, supra,* at § 1.11. An interest in a copyright is a property right protected by the due process and just compensation clauses of the Constitution. *See Loretto v. Teleprompter Manhattan CATV Corp.,* —— U.S. ——, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 82 n. 6, 100 S.Ct. 2035, 2041 n. 6, 64 L.Ed.2d 741 (1980). The agreement between Roth and the appellees, pursuant to which Roth surrendered any rights she might otherwise have obtained in the copyright, was valid when it was entered into, and a subsequently enacted statute which purported to divest Pritikin and McGrady of their interest in the copyright by invalidating the 1977 agreement could be viewed as an unconstitutional taking. *See, e.g., Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *see also* Michelman, *Property, Utility, And Fairness: Comments On The Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165 (1967). Resolution of this issue is not required for our holding, and will have to wait for an appropriate case.

Moreover, the district court failed to make any findings relevant to this question, and accordingly, we do not decide whether retroactive application would, in fact, violate constitutional restrictions. Even the spectre of a constitutional issue concerning the proper application of the "takings clause", however, is sufficient cause to construe the statute to provide for exclusively prospective relief, particularly in the absence of any clear congressional mandate to the contrary. *United States v. Security Indus. Bank, supra,* —— U.S. at ——, 103

S.Ct. at 413; *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932).

## IV

We are of the view, therefore, that Roth knowingly and purposefully entered into a contract in 1977. She consented to create recipes for inclusion in a book in return for $3,000. Accordingly, we affirm the district court.