NATIONAL CENTER FOR JEWISH FILM, INC., Plaintiff,

v.

Eric GOLDMAN and Ergo Media, Inc., Defendants,

v.

Sharon Pucker RIVO, Third Party Defendant.

Civil Action No. 94–10786–WGY.

United States District Court, D. Massachusetts.

Oct. 22, 1996.

Jenifer Paine, Wolf, Greenfield & Sacks, Boston, MA, for National Center for Jewish Film, Inc.

William S. Strong, Kotin, Crabtree & Strong, Boston, MA, for Eric Goldman, Ergo Media, Inc.

Michael L. Oliverio, Wolf, Greenfield & Sacks, Boston, MA, for Sharon P. Rivo.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

### I. Introduction

The subject of this unusual lawsuit is the copyright ownership rights to a restored historical film entitled "Jews of Poland/Five Cities" (the "Film") chronicling Jewish life in prewar Poland, and four popular musical compositions (the "Songs") from two separate prewar movies.[1] The Plaintiff, National Center for Jewish Film, Inc. (the "Center"), based at Brandeis University in Massachusetts, filed two separate motions for partial summary judgment in its lawsuit against Eric Goldman ("Goldman") and Ergo Media, Inc. ("Ergo," collectively, the "Defendants"). The Defendants had previously filed a Counterclaim and Third Party Complaint against the Center and its Executive Director, Sharon P. Rivo ("Rivo"), which alleged (1) that Ergo had the exclusive right to distribute copies of the Film and videocassette rights in the Songs and (2) that the Center's and Rivo's activities in manufacturing, advertising, and selling videocassettes of the Film and movies containing the Songs infringed upon Ergo's rights.[2]

At a motion hearing on September 12, 1996, this Court heard oral argument on the Center's Motion for Partial Summary Judgment on Counterclaim Count II (copyright infringement of the Film) and Counterclaim Counts III through VI (copyright infringement of the Songs). Ergo argued in support of its cross-motion for partial summary judgment on Counterclaim Counts III through VI. After careful consideration of the issues raised in the briefs and at oral argument, this Court denied from the bench the Center's Motion for Partial Summary Judgment on Counterclaim Count II (concerning the Film), and took under advisement the cross-motions for partial summary judgment on Counterclaim Counts III through VI (concerning the Songs). Thereafter, on September 23, 1996, this Court denied the motion for Partial Summary Judgment on this aspect of the case as well. This memorandum deals with the issues earlier taken under advisement (i.e., the Songs issues).

### II. Summary Judgment Standard

Summary judgment is appropriate as to a claim or defense under Rule 56 of the Federal Rules of Civil Procedure only where the moving party can demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that there is "no genuine issue as to any material fact," and that it "is entitled to a judgment as a matter of law." *CMM Cable Rep, Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504, 1512 (1st Cir. 1996) (citing *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 2 (1st Cir.1996)); *see* Fed.R.Civ.P. 56(c). The moving party has the burden of establishing the lack of a genuine, material factual issue. *Wayfield v. Tisbury*, 925 F.Supp. 880, 881 (D.Mass.1996) (citing *Snow*

---

1. The Songs are entitled "Yidl Mitn Fidl" ("Yiddle With a Fiddle")—the title track to the movie of the same name, "Abi Gezunt," "Ich Zing" ("I Sing"), and "Mazel" ("Luck"). The three latter Songs are contained in a movie called "Mamele" ("Little Mother").

2. The Defendants' Counterclaim and Third Party Complaint is essentially a rebuttal to the Center's original Complaint. In fact, the counterclaims read like charges filed in retaliation for the Center's bringing suit against the Defendants in the action presently pending before this Court.

*v. Harnischfeger Corp.*, 12 F.3d 1154, 1157 (1st Cir.1993), *cert. denied*, — U.S. —, 115 S.Ct. 56, 130 L.Ed.2d 15 [1994]) (citations omitted). A factual dispute is "genuine" if a reasonable jury could resolve the point in favor of the nonmoving party. *Rodriguez–Pinto v. Tirado–Delgado*, 982 F.2d 34, 38 (1st Cir.1993). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). Finally, the evidence must be read "in the light most flattering to the nonmovant," and the court should "indulg[e] all reasonable inferences in that party's favor." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994).

### III. Undisputed Facts

This case is factually complex, but the relevant undisputed facts concerning the Songs bear repeating here. Between 1936 and 1938, Joseph Green ("Green") wrote, directed, and produced the two movies in which the Songs appear. Green hired Abraham Ellstein ("Ellstein"), a well-known theatrical composer, to compose the songs and Itzhak Manger ("Manger") and Molly Picon ("Picon") to write the lyrics. As the movies were being filmed in Poland, Green paid for Ellstein, Manger, and Picon to travel to Poland to compose the Songs and write the lyrics while the movies were being produced. At the time, Ellstein was a well-known theatrical composer, holding numerous copyrights with the United States Copyright Office. These Songs, however, were not commenced or conceived of prior to Green's solicitation.

### IV. Discussion

In Counterclaim Counts III through VI, the Defendants claim that Ergo is the holder of exclusive videocassette rights in the Songs through a chain of title starting with Ellstein, the composer. Ergo alleges that the

Center published and advertised videocassettes of the movie "Yidl Mitn Fidl," which contained one of the Songs, without Ergo's authorization in violation of 17 U.S.C. § 106.[3] According to the facts as alleged by Ergo, in May 1988 Goldman received an exclusive written license (the "May 1988 Agreement") from the alleged then-owners of the Songs to make videocassette copies of movies containing the Songs. Affidavit of Eric Goldman (Doc. No. 41) at ¶ 9. Save for the testimony of Ellstein's widow—which, as shown below, is legally suspect and is contested by the Center—no evidence has been presented to document the chain of title from Ellstein to the publishers from whom Goldman received his exclusive license.

The Defendants argue that Rivo and the Center should have been on notice that copyright in the Songs was owned separate from the movies, since Ellstein and Manger assigned copyright in "Yidl Mitn Fidl" to Henry Lefkowitch ("Lefkowitch") sometime before July 1938, *see* Ellstein Affidavit at ¶¶ 5, 8, and Lefkowitch published "Yidl Mitn Fidl" in sheet music form in July 1938, *see* Ellstein Affidavit, Ex. 1.[4] Lefkowitch later registered the song in the United States Copyright Office under the Copyright Act of 1909 (the "1909 Act") and listed July 10, 1938 as the date of first publication. Memorandum in Support of Plaintiff and Counter–Defendant's Motion for Partial Summary Judgment of Claims Three, Four, Five, and Six of Counterclaims and Third Party Complaint ("Plaintiff's Memorandum") (Doc. No. 32), Ex. 1 at 8. In 1966, Sylvia Ellstein renewed copyright in the Songs at the expiration of the first term of copyright. Plaintiff's Memorandum, Ex. 1 at 2–7, 9. Although Sylvia Ellstein avers that both she and Ellstein "relied on [Ellstein's] ASCAP royalties and sheet music royalties for a substantial share of our income," she does not state that either she or Ellstein ever received royalties from the specific Songs. Ellstein Affidavit at ¶ 2.

---

3. Paraphrased, 17 U.S.C. § 106 states that the owner of a copyright under title 17 has the exclusive rights to authorize any reproductions of the copyrighted work, preparation of derivative works based on the copyrighted work, distribution of any copies or phonographs of the copyrighted work to the public. *See* 17 U.S.C. §§ 106(1)–(3).

4. The sheet music for "Yidl Mitn Fidl" bears a copyright mark with the year 1938 and Lefkowitch's name prominently displayed at the bottom of the page, and Ellstein is credited as the composer. Ellstein Affidavit, Ex. 1.

Undaunted by these allegations, the Center asserts, as a threshold matter, that it—not Ergo—"is the assignee of all right, title, and interest to the films (and, consequently, the Songs) of Joseph Green, and therefore 'stands in his shoes.'" Plaintiff's Memorandum at 2. The Center supports its claim by a signed and notarized license agreement between the Center and Green dated January 1, 1990 which grants the Center the exclusive rights to distribute the movies containing the Songs (the "January 1990 Agreement"). *See* Plaintiff National Center for Jewish Film, Inc.'s and Sharon Rivo's Answer and Affirmative Defenses to Defendant's Amended Answer, Counterclaims, and Third Party Complaint Dated April 20, 1995 ("Plaintiff's Answer") (Doc. No. 21), Ex. A. As Ergo does not dispute either the existence of the January 1990 Agreement or the merits of the Center's claim to the movies which contain the Songs, this Court accepts the validity of the January 1990 Agreement pursuant to Fed.R.Civ.P. 56(c). *See also* Fed.R.Civ.P. 56(d) ("the court ... by examining the pleadings and the evidence before it ... shall ... ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted").

Proceeding apace on a relatively solid evidentiary foundation, the Center presents two arguments in support of its motion for partial summary judgment. First, the Center maintains that since Green created the movies in which the Songs appear and hired Ellstein, Manger, and Picon to compose and write the Songs, *see* Green Deposition at 5, 6, 7, 11–14, 29, there is a presumption that the Songs belong to Green under the "work for hire" doctrine of the 1909 Act which has not been rebutted by satisfactory evidence of a contrary agreement as required by law. Second, the Center argues that the copyright registrations for the Songs relied upon by Ergo are void and invalid as matter of law, and cannot be the bases for a copyright infringement suit. Each argument is considered below.

### A. The "Work for Hire" Doctrine

These Songs were created in the 1930s, well before the advent of a unified federal law of copyright in 1978. As such, the 1909 Act, 17 U.S.C. § 1 *et seq.*, applies. *See Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 553 (2nd Cir.1995) (applying work for hire provision of the 1909 Act to paintings produced beginning in 1974); *Forward v. Thorogood*, 758 F.Supp. 782, 784 n. 4 (D.Mass. 1991), *aff'd*, 985 F.2d 604 (1st Cir.1993) (same) (music tapes created in February 1976).[5] At the time of the Songs' composition, the 1909 Act contained a work for hire provision which provided that "in the interpretation and construction of this title ... the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (1976 ed.) (repealed 1976). Unfortunately, as Congress neglected to define the relevant terms "employer" and "works made for hire" in the 1909 Act, the federal courts—as they sometimes must—were left to discern Congress' meaning and intent.

Beginning with the landmark case *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 31 (2nd Cir.1939), *cert. denied*, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940), and later in *Shapiro, Bernstein & Co., Inc. v. Jerry Vogel Music Co., Inc.*, 221 F.2d 569, 570 (2d Cir.1955), *rev'd*, 223 F.2d 252 (2nd Cir.1955), courts generally adhered to the interpretation that the 1909 Act's work for hire doctrine referred solely to works made by employees in the regular course of their employment. Commissioned works—paintings, statues, and the like—were treated as if the commissioned party impliedly agreed to convey the copyright along with the work itself to the hiring party. *See Playboy Enter., Inc.*, 53 F.3d at 554 (citing *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 745, 109 S.Ct. 2166, 2175, 104 L.Ed.2d 811 (1989) [chronicling the legislative history behind the work for hire doctrine]); *Murray v. Gelderman*, 566 F.2d 1307, 1310 (5th Cir.1978); *see also Lin–Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir.1965). In a case which explicitly applied the work for hire

---

**5.** The current copyright law, known as the Copyright Act of 1976 (the "1976 Act"), is codified at 17 U.S.C. § 101 *et seq.* and became effective on January 1, 1978.

doctrine to independent contractors as well as employer-employee relationships, the court in *Lin–Brook* held:

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature ... the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin–Brook Builders Hardware*, 352 F.2d at 300. The "instance and expense" test has been adopted and adhered to by the First Circuit, which stated in one of the few cases within this Circuit to address the work for hire doctrine that:

> Although initially confined to the traditional employer-employee relationship, the [1909 Act's work for hire] doctrine has been expanded to include commissioned works created by independent contractors, with courts treating the contractor as an employee and creating a presumption of copyright ownership in the commissioning party at whose 'instance and expense' the work was done.

*Forward*, 985 F.2d at 606 (citations omitted). The Second Circuit has adopted the "instance and expense" test as well, *see Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567–68 (2d Cir.1966), and has defined the test as being met "when the 'motivating factor in producing the work was the employer who induced the creation.'" *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir.1974) (quoting *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir.) *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972)). There is one exception to the presumption in favor of the hiring party as author of a work for hire, however, in that written or oral evidence of a contrary agreement may divest an "author" of the work for purposes of the 1909 Act of his right to a copyright. *See Playboy Enter., Inc.*, 53 F.3d at 554 (citing *Roth v. Pritikin*, 710 F.2d 934, 937 n. 3 (2d

Cir.), *cert. denied*, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983)).

### B. Are the Songs "Works for Hire" Under the 1909 Act?

■ In their cross-motion for partial summary judgment, the Defendants attempt to claim that Ellstein was "at most a commissioned composer ... certainly not an employee of Green." As an independent contractor, therefore, the Defendants argue that Ellstein ought be subject to a different interpretation of the work for hire doctrine under the 1909 Act. Their interpretation of relevant law is that where the creator of a work is an independent contractor rather than a regular employee, it is presumed that the creator only transfers the first term of copyright to the employer.[6] Thus, under their view, it does not matter whether Ellstein transferred his copyright in the Songs to Green or to Lefkowitch after their composition in the late 1930s, since he retained a reversionary interest in the songs following the first 28–year copyright term following registration in 1938. Sylvia Ellstein, as his successor in interest, was therefore within her rights when she renewed the copyrights in 1966. *See* Memorandum of Eric Goldman and Ergo Media, Inc. in Opposition to National Center for Jewish Film's Motion for Partial Summary Judgment on Counts III—VI of their Counterclaims ("Defendant's Memorandum") (Doc. No. 40) at 14–15. As support for this novel interpretation, the Defendants rely upon a 1955 Second Circuit case, *Shapiro, Bernstein & Co., Inc.*, 221 F.2d at 570 (2d Cir.1955). In *Shapiro*, the employee was hired by a publisher for whom he worked to write lyrics to a song "as a special job assignment, outside the line of his regular duties for the [company]," thus placing him outside of the traditional employer-employee relationship. *Id.* at 570. The court expressly stated that the employee's "right [as an author] to an original copyright passed to [the employer] *under his original contract* with [the employer] to write a lyric for [the song]." *Id.* It is clear, based upon the specific facts of *Shapiro*, that the author had

---

6. The 1909 Act provided authors of works a 28–year initial term of copyright protection in addition to a 28–year renewal term. *See* 17 U.S.C. § 24 (1976 ed.), *cited in Stewart v. Abend*, 495 U.S. 207, 212, 110 S.Ct. 1750, 1755–56, 109 L.Ed.2d 184 (1990).

a contractual agreement with the employer by which the employee had presumably transferred or assigned the first term of his copyright. This case is thus factually distinct from the facts of the case at bar, and *Shapiro* does not lend itself, nor has it been construed by any other court, to support the proposition that independent contractors, absent a contract, presumptively transfer the first term of their copyright to the employer.

Whether Ellstein was a commissioned composer or not is legally irrelevant, for the evidence is undisputed that Ellstein, Manger, and Picon were hired and paid by Green to compose the Songs. This alone is enough to satisfy the "instance and expense" test as outlined in *Forward* and earlier cases. *See, e.g., Playboy Enter.,* 53 F.3d at 555 (stating that "[t]he simple fact that Playboy paid [the defendant] a fixed sum for each of the works published in Playboy magazine is sufficient to meet the requirement that the works be made at Playboy's expense"). *Forward,* the First Circuit case, is also instructive on this point as it involved an individual who sued a music band over the ownership of certain demonstration tapes created with the individual's financial assistance. The First Circuit refused to apply the doctrine because the evidence at trial indicated that although the plaintiff booked and paid for studio time used to create the demonstration tapes, "he neither employed nor commissioned the band members nor did [the plaintiff] compensate or agree to compensate them." *Forward,* 985 F.2d at 606. Here, Green paid for Ellstein, Manger, and Picon to travel to Poland for the specific purpose of writing the Songs for their incorporation into movies produced by Green. Absent Green's urging as the "motivating factor" behind the production of the movies, the solicitation of Ellstein, and the trip to Poland paid for by Green, there would have been no Songs. These facts, which are undisputed by the Defendants and averred to by Green, *see* Plaintiff's Memorandum, Ex. 2 ("Green Deposition"), are dispositive of this aspect of this case.

The only factual scenario which could provide the Defendants any relief under the law is the situation which would arise if Ellstein and Green had a contract between them which made Ellstein the "author" for the purposes of copyrighting the Songs. *See Roth,* 710 F.2d at 937 n. 3. The Defendants try valiantly to establish such a factual predicate, but unfortunately come up wanting. Although Green testified in his own deposition that he and Ellstein had a contract for the Songs, he also stated that he did not remember the terms, and mentioned nothing about copyright.[7] *See* Green Dep. at 20. The only evidence about a potential contract between Ellstein and Green is the affidavit testimony of Ellstein's widow, Sylvia Ellstein. In an effort to create an alleged disputed issue of fact, Sylvia Ellstein has sworn, in relevant part, that:

(2) My husband told me that his deal with Mr. Green was that Mr. Green would have the right to use the music in his films but that my husband would retain the copyrights.

(3) The arrangement my husband had with Joseph Green was the same as he always made with music that he wrote for musical comedies, movies, and the like. He always retained copyright, giving a limited license to the theatrical or cinema producer.

Ellstein Aff., ¶¶ 2–3.

Sylvia Ellstein's testimony in paragraph 2, which concerns the existence of a contract between her husband and Green, is classic hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). It is therefore inadmissible at trial, Fed.R.Evid. 802, unless one of the numerous exceptions to the hearsay rule apply, *see* Fed.R.Evid. 803, 804. Here, no recognized exception applies. Federal Rule of Civil Procedure 56(e), which governs the form of affidavits submitted in support of a motion for summary judgment, states that "[s]upporting and opposing affidavits shall be

---

7. Green's only description of the terms of the contract was: "Very simply, write the music for Mamele and conduct the orchestra," although he

later admitted that he couldn't remember all the details given the passage of time. Green Dep. at 20.

made on personal knowledge, shall set forth such facts as would be admissible in evidence...." Fed.R.Civ.P. 56(e). It is axiomatic on motions for summary judgment that rebuttal testimony which is hearsay is insufficient as matter of law to defeat an opposing motion. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment"); *Pakizegi v. First Nat. Bank of Boston,* 831 F.Supp. 901, 909 (D.Mass.1993) (holding double hearsay statement in an affidavit inadmissible to defeat summary judgment). Since Sylvia Ellstein's testimony is inadmissible hearsay, her statements concerning her husband's negotiations with Green are not considered.

Sylvia Ellstein's second statement, paragraph 3, if made on personal knowledge, may be admissible as descriptive of her husband's routine business practices and his possible retention of copyright in the Songs. *See* Fed.R.Evid. 406. Here, however, there is no evidence that Sylvia Ellstein, who did not marry Ellstein until more than three years after the composition of the Songs, had personal knowledge of her husband's arrangement (if any) with Green. Thus, paragraph 3 likewise cannot be considered under Fed.R.Civ.P. 56(e).

### C. Are the 1938 and 1966 Copyright Registrations Valid as Matter of Law?

■ In order to maintain a claim for copyright infringement, a claimant must establish ownership of a valid copyright and the unauthorized copying of a protected work. *See Feist Publications v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991); *CMM Cable Rep, Inc.,* 97 F.3d at 1512 (1st Cir.1996); *Accusoft Corp. v. Palo,* 923 F.Supp. 290, 295 (D.Mass. 1996) (citing *Lotus Dev. Corp. v. Borland Int'l Inc.,* 49 F.3d 807, 813 (1st Cir.1995) [collecting cases], *aff'd,* —— U.S. ——, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996)). It is the first prong of the suit requirement which here proves fatal to Ergo's claim.

In *Motta v. Weiser,* the First Circuit held that "[i]f a plaintiff is not the author of the copyrighted work then he or she must estab-lish a proprietary right through the chain of title in order to support a valid claim to the copyright." 768 F.2d 481, 484 (1st Cir.1985). This suit for copyright infringement cannot go forward with respect to the Songs because, as outlined above, Ergo cannot prove its ownership interest in a valid copyright. Indeed, assuming *arguendo* that Ellstein did in fact have a copyright interest in the Songs, there are apparently fatal flaws in the chain of title from Ellstein to Ergo. First, the only evidence to support the Defendants' contention that Green agreed to assign his rights in the Songs to Ellstein is Sylvia Ellstein's affidavit. Second, again assuming Ellstein's possession of a valid copyright, there is no evidence concerning the alleged transfer from Ellstein to Lefkowitch sometime before 1938. Third, there is likewise no evidence about the transfer (if any) from Lefkowitch to the music publisher. Finally, the May 1988 license agreement is all that is submitted to link Ergo to the Songs—hardly a conclusive chain of title. Where, as here, the Defendants have not established their chain of title, they have no standing to bring an action under the copyright laws. *See id.*

### V. Conclusion

As sometimes happens, the discipline of writing forces reconsideration of matters decided from the bench. So here. Upon reconsideration, the order of September 23, 1996, denying the cross-motions for summary judgment as to the Songs is vacated and this Court now ***GRANTS*** the Center's Motion for Partial Summary Judgment as to the Songs (Counterclaim Counts III through VI) and ***DENIES*** the Defendants' Motion for Partial Summary Judgment upon the same counts. Furthermore, given the status of the previously registered copyrights in the Songs, this Court finds and declares that Green is and remains the author of the Songs for copyright purposes. Any copyrights filed for or by Ellstein, his assignees, or successors in interest are the property of Green and his successors and must be held in trust for Green.