Andres **GUILLEMARD GIONORIO,**
**Plaintiff(s)**

v.

Fermin M. **CONTRERAS GOMEZ,**
**et al., Defendant(s).**

**Jorge R. Urrutia Valles,**
**et al., Plaintiff(s)**

v.

**Fermin M. Contreras Gomez,**
**et al., Defendant(s).**

**Nos. CIV. 03–2317(JAG),**
**CIV. 03–2390(JAG).**

United States District Court,
D. Puerto Rico.

Feb. 4, 2004.

Joan Schlump–Peters, Harvey B. Nachman Law Offices, San Juan, PR, Joseph D. Steinfield, Prince, Lobel, Glovsky & Tye LLP, Hill & Barlow, Boston, MA, Charles A. Cuprill–Hernandez, San Juan, PR, for Plaintiffs.

Eduardo A. Vera–Ramirez, Landron & Vera LLP, Guaynabo, PR, Ivonne Palerm–Cruz, Commonwealth Department of Justice, Federal Litigation Division, San Juan, PR, for Defendants.

## OPINION AND ORDER GRANTING PRELIMINARY INJUNCTIVE RELIEF

GARCIA–GREGORY, District Judge.

On December 10, 2003, Lone Star Insurance Producers, Inc. ("Lone Star"), and its shareholders Andres Guillemard Ginorio ("Guillemard"), his wife Maria M. Noble Fernandez ("Noble"), and the conjugal partnership constituted between them (collectively the "Lone Star Plaintiffs"), filed suit seeking redress for violations to their civil rights and a declaratory judgment, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, against Fermin M. Contreras ("Contreras"), for damages in his individual capacity and for injunctive relief in his official capacity as the Insurance Commissioner of Puerto Rico, his wife Jane Doe, the Office of the Insurance Commissioner (the "OIC"), and various John Doe and Jane Doe defendants (collectively "defendants")(Civ.No.03–2317(JAG), Docket No. 1). On December 30, 2003, the Lone Star plaintiffs filed a verified amended complaint (Civ. No. 03–2317(JAG), Docket No. 7) and moved the Court for the issuance of a Temporary Restraining Order ("TRO") enjoining defendants from revoking the Lone Star Plaintiffs' insurance agent licences pending a pre-deprivation hearing (Civ. No. 03–2317(JAG), Docket No. 8). On December 31, 2003, the Court granted their request and issued a TRO enjoining defendants from revoking the Lone Star plaintiffs' insurance agent licences, ordering defendants to file a brief stating their position on the deprivation of plaintiffs' due process rights by 4:00 p.m. on January 16, 2004, and setting a hearing on January 20, 2004 on plaintiffs' request for the entry of preliminary injunctive relief (Civ. No. 03–2317(JAG), Docket No. 9).

On December 31, 2003, Jorge R. Urrutia Valles ("Urrutia"), his wife Carolyne J. Wiewall Navas ("Wiewall"), the conjugal partnership constituted between them, and Urrutia Valles, Inc. ("UVI")(collectively the "UVI Plaintiffs"), filed a similar suit against the defendants (Civ. No. 03–2390(JAG), Docket No. 1), and moved for the issuance of a TRO enjoining defendants from revoking their insurance broker licenses pending a pre-deprivation hearing (Civ. No. 03–2390(JAG), Docket No. 2). Simultaneously, the UVI Plaintiffs requested that the case, initially assigned to U.S. District Judge Carmen C. Cerezo, be transferred to the undersigned because of the common nucleus of operative facts underlying their complaint and the Lone Star Plaintiffs' complaint (Civ. No. 03–2390(JAG), Docket No. 3). On January 2, 2004, the Court granted the UVI Plaintiffs' requests and issued the TRO with similar terms to the Lone Star Plaintiffs' TRO and consolidated both cases for purposes of the preliminary injunctive relief requested (Civ. No. 03–2390(JAG), Docket Nos. 4 & 5).

On January 20, 2004, the Court held a hearing where both parties presented their arguments Plaintiffs presented the testimony of Guillemard and Urrutia as well as certain documents which the Court received into evidence as exhibits (Civ. No. 03–2317(JAG), Docket Nos. 20 & 21). Defendants opted not to present any witnesses or documents. At the conclusion of the hearing, the Court extended the TRO until February 4, 2004, and ordered both parties to file simultaneous briefs on the arguments raised during the hearing. Having received and reviewed the parties' briefs (Civ. No. 03–2317(JAG), Docket Nos. 23 & 26), as well as the testimony and exhibits received into evidence, and for the reasons discussed below, the Court hereby **GRANTS** the Lone Star and UVI Plaintiffs' request for preliminary injunctive relief.

## FACTUAL BACKGROUND[1]

### A. *The Lone Star Plaintiffs*

In 1984, Guillemard and Noble, each of them holding an insurance agent's license issued in accordance with the Insurance Code of Puerto Rico, formed Lone Star and assigned to it their licenses. They have conducted business through Lone Star ever since, never receiving any complaints regarding their services or trustworthiness.

Lone Star first did business with a government agency in 1993, when it placed insurance for the Puerto Rico Ports Authority. In 1994, the Government of Puerto Rico determined that public authorities and government agencies should be represented by licensed insurance brokers for the purposes of obtaining insurance. Guillemard met with then Commissioner of Insurance Juan Garcia, who advised him to affiliate with an insurance broker and suggested doing so with Urrutia. Lone Star then entered into a consortium with UVI (the "consortium"), through which they successfully obtained insurance for the Puerto Rico Aqueducts and Sewer Authority, the Puerto Rico Electrical Power Agency, and the Puerto Rico Telephone Company. Lone Star and UVI shared commissions on premiums for insurance of the kind that plaintiffs were licensed to solicit. The OIC and the governmental agencies were aware at all times of the arrangement between Lone Star and UVI.

Beginning in late November 2001 and until December 17, 2001, David Castro–

---

1. Because there is no dispute as to the facts leading up to the complaint, the relevant facts are taken from the plaintiffs' joint memorandum (Civ. No. 03–2317(JAG), Docket No. 23) and their complaints (Civ. No. 03–2317(JAG), Docket No.1, Civ. No. 03–2390(JAG), Docket No. 1), unless otherwise noted.

Anaya ("Castro"), an auditor for the OIC, reviewed Lone Star's transactions for the period between 1997 and 2001, including all documents pertaining to the insurance provided to the government agencies and the commissions shared with UVI. The Lone Star Plaintiffs gave their full cooperation to Castro, providing him with all the documents he requested and answering all his questions. Furthermore, Guillemard informed Castro that Lone Star had performed extensive work in connection with securing and servicing the government agencies' accounts, and sent him a letter detailing these efforts. On the last day of the audit, Castro informed Guillemard that he had found no irregularities and that he would send a final report in early 2002.

The consortium between Lone Star and UVI ended in 2000. Lone Star continues to serve its business and individual clients, but has not provided insurance services to any government agency since. The Lone Star Plaintiffs' licenses have been renewed twice since the 2001 audit.

In early 2002, Guillemard learned that the OIC had ordered several banks to provide financial information pertaining to Lone Star as well as all of Guillemard's and Noble's personal and business affairs. Guillemard also learned that Contreras had made disparaging remarks regarding his and Noble's political affiliation. On December 10, 2003, the Lone Star Plaintiffs filed this action. Contreras was served with summons on December 19, 2003.

On December 23, 2003, Contreras, without affording them with notice or an opportunity to be heard, issued an order declaring the Lone Star Plaintiffs as nontrustworthy and incompetent. Furthermore, the order purported to revoke their insurance agent licenses for a period of five years, prevent them from applying for any other license during the same five-year period, and impose a fine in the amount of two-million thirty-five thousand dollars ($2,035,000). The order would become effective on January 7, 2004. The order also informed the Lone Star Plaintiffs of their right to request a hearing within twenty days from the order, which would stay the imposition of the fine. The revocation of their licenses, however, would remain in effect pending a hearing and a final decision. The request for a TRO and preliminary injunctive relief claiming due process violations soon followed. The Lone Star plaintiffs timely requested a hearing before the OIC, which will be held on March 2, 2004 (Tr. at 155).

The Lone Star Plaintiffs are active members of the New Progressive Party, and have contributed their time and given their financial support to its candidates.

B. *The UVI Plaintiffs*

Urrutia has been involved in the insurance business in Puerto Rico since June 1974 and obtained his insurance broker license on October 27, 1980. In October 1983, Urrutia organized and incorporated UVI. On January 1984, UVI obtained licenses as an insurance broker and a broker for excess lines. On July 1, 2002, UVI sold its insurance portfolio AON B & C, Inc. UVI's licenses remained in effect until August 12, 2002. Since July 2002, Urrutia holds the position of Executive Vice–President in charge of marketing for AON Risk Services of P.R., Inc. At this time, UVI is an inactive corporation.

Between 1984 and 2002, UVI provided insurance products and services to numerous clients, establishing an excellent reputation in the process. Urrutia has been recognized as an outstanding insurance broker with an excellent reputation, and was selected as insurance broker of the year in 1985 and 1994 by Professional Insurance Agents of Puerto Rico and the Caribbean, Inc.

In 1993, following a directive from the Secretary of the Treasury of Puerto Rico requiring all government agencies to engage brokers for the purpose of acquiring insurance, UVI submitted its qualifications and was selected as one of eight firms certified to provide such services. In 1994, UVI and Lone Star entered into a consortium (the "consortium"), which was fully disclosed to the Secretary of the Treasury and the OIC. From 1994 to approximately April 2001, Urrutia, acting on behalf of the consortium, negotiated insurance policies and provided related insurance services to several government agencies and public corporations.

In May 2001, after a change in government following the 2000 general elections, then Secretary of the Treasury Juan Flores Galarza ("Flores") announced an investigation of all insurance entities which had been providing insurance services to government agencies during the previous administration. Flores specifically named UVI as a target of the investigation for alleged favoritism in the awarding of insurance business. On or about November 2001, Contreras ordered an investigation of Lone Star's and UVI's operations and transactions from January 1997 through September 30, 2001. Specifically, the investigation targeted the consortium's transactions with government agencies and the revenues received by Lone Star as a result of those transactions. This was the first time UVI had been investigated since its inception in 1984. The investigation was conducted by Angela Rivera Soto, who received the full cooperation of the UVI Plaintiffs. The investigation ended on or about the last week of January 2002. The investigator stated that she did not find what she was looking for (Tr. at 142).

On December 23, 2003, Contreras, without affording them notice or a hearing, issued an order declaring UVI Plaintiffs as unreliable and incompetent to participate in the insurance business in Puerto Rico. Furthermore, the order purported to revoke their insurance broker licenses for a period of five years, prevent them from applying for any other license during the same five-year period, and impose a fine in the amount of two-million five-hundred sixty-seven thousand nine-hundred dollars ($2,567,900). The order would become effective on January 7, 2004. The order also informed the UVI Plaintiffs of their right to request a hearing within twenty days from the order, which would stay the imposition of the fine. The revocation of their licenses, however, would remain in effect pending a hearing and a final decision. Their complaint and request for a TRO and preliminary injunctive relief claiming due process violations soon followed. The UVI plaintiffs timely requested a hearing before the OIC, which will be held on February 24, 2004 (Tr. at 155).

The UVI Plaintiffs are active members of the New Progressive Party, and have contributed their time and given their financial support to its candidates.

## DISCUSSION

As previously stated, on January 20, 2004, heard the parties on plaintiffs' request for the entry of preliminary injunctive relief. During the hearing, the parties argued the issue of due process and whether preliminary injunctive relief is warranted at this time. Furthermore, the Court heard the testimony of Guillemard and Urrutia and received into evidence as exhibits certain documents presented by plaintiffs. Defendants did not present any witnesses or documentary evidence, but raised the issues of abstention, under *Younger*[2] and/or *Burford*[3], qualified, abso-

---

2. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

3. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

lute, and sovereign immunity, and argued for a dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). The Court did not allow defendants to argue dismissal at the hearing, but allowed the arguments on abstention (Tr. at 22–30). Furthermore, because of the complexity of the issues, and because some were raised for the first time at the preliminary injunction hearing, the Court ordered both parties to file simultaneous supplemental briefs limited to the arguments of due process, abstention, and absolute immunity (Tr. at 150).

Nevertheless, defendants in their supplemental memorandum again raise the issue of dismissal for failure to state a claim, and qualified and sovereign immunity. The Court will not at this time entertain the motion to dismiss under Fed. R.Civ.P. 12(b)(6) nor the qualified or sovereign immunity arguments because the only issue the Court will consider at this point in the proceedings is whether preliminary injunctive relief should be granted pending the outcome of the case. In other words, the Court will limit its ruling at this time to whether or not to stay the Commissioner's order insofar as it purports to revoke plaintiffs' licenses without a predeprivation hearing.

Qualified immunity shields defendants from monetary damages, not injunctive relief, and thus has no bearing on the issues now before the Court. *See, e.g.,* *Rodriguez Rodriguez v. Muñoz Muñoz,* 808 F.2d 138, 142 (1st Cir.1986); *Mafuz Blanco v. Tirado Delgado,* 641 F.Supp. 1287, 1290 (D.P.R.1986). Similarly, sovereign immunity shields the Government of Puerto Rico from monetary damages and does not inhibit this Court's discretion to issue injunctive relief against it's officials. "The plaintiffs in this case are seeking an injunction, not money damages. Regardless of any congressional abrogation or state waiver of immunity, federal courts have the power to enjoin state officials to conform their conduct to the requirements of federal law." *New Progressive Party v. Hernandez Colon,* 779 F.Supp. 646, 652 (D.P.R.1991)(*citing Ex parte Young,* 209 U.S. 123, 155–6, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). (*See also Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir. 1983)).

The motion to dismiss also relates to the liability and damages part of the case and need not be considered prior to the issuance of a preliminary injunction. Accordingly, defendants may resubmit the motion in accordance with the Case Management Order which shall issue once they answer the complaint.[4]

A. *Abstention under Younger*

Pursuant to the abstention doctrine set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts must abstain from issuing injunctive relief when there is a pending state criminal proceeding, absent bad faith, harassment, or a patently invalid state statute. *Id.* at 54, 91 S.Ct. 746.

> Younger abstention is based on the dual principles of equity and comity. The equitable basis dictates that federal courts should refrain from taking action when there is an adequate remedy at law and denial will not result in irreparable injury, while comity commands the proper respect for state courts, based on separation of powers principles.

*El Dia, Inc. v. Rossello,* 30 F.Supp.2d 160, 176 (D.P.R.1998). This doctrine has been extended to cover state administrative proceedings involving important state inter-

---

4. The Court notes that defendants are technically in default since they have not yet filed an answer to the complaint and their filings so far are in relation to the issue of injunctive relief.

ests. *See, e.g., Ohio Civil Rights Comm'n. v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).

In order for the Court to abstain under *Younger,* three criteria must be met: (1) there must be ongoing state proceedings that are *judicial in nature;* (2) the state proceedings must implicate important state interests; and (3) the state proceedings *must afford an adequate opportunity to raise the constitutional challenges. Middlesex County Ethics Committee v. Garden State Bar Ass'n.,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). As exceptions to the rule of *Younger,* federal courts should not abstain where the state proceedings are undertaken in bad faith or other extraordinary circumstances are involved or a patently unconstitutional statute is at issue. *Younger,* 401 U.S. at 54, 91 S.Ct. 746.

In this case, there is no question that the insurance industry implicates important state interests. Accordingly, the second criterium is met. Defendants' arguments for the application of the *Younger* abstention doctrine, however, fail to satisfy the first and third criteria.

Defendants argue that the investigation conducted by the OIC constitutes an ongoing state proceeding because it is an integral part of an agency's adjudicative process regarding possible violations which may merit the revocation of plaintiffs' licenses. In support of their argument, defendants claim that this Court has already determined that an investigation by an administrative agency constitutes an ongoing state proceeding. *See El Dia,* 30 F.Supp.2d at 176. Their reliance on *El Dia,* however, is flawed. In *El Dia,* there was an ongoing investigation at the time the complaint was filed. By the time the Court considered the abstention issue, however, the administrative proceedings had ended and the matter awaited review by the Supreme Court of Puerto Rico. *Id.*

At 176–7. It was *this pending appeal* which the Court considered to be an ongoing state proceeding, and *not* the investigation itself. *Id.* Therefore, *El Dia* does not support defendants' claim.

In order for a proceeding to qualify as an ongoing state proceeding for purposes of *Younger,* it must be judicial in nature. *See New Orleans Public Service, Inc. v. Council of City of New Orleans ("NOPSI"),* 491 U.S. 350, 369–71, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end." *Id.* at 370. The type of investigation that this definition espouses is compared to that of a Judge who just "[a]s [he] is bound to declare the law, must know or discover the facts that establish the law." *Id.* at 371. Accordingly, as this Court must do when investigating the facts of a case and applying the law, the administrative proceeding that *Younger* is meant to protect must provide the parties involved with an opportunity to be heard and to present their version of the facts before a final determination is made; a neutral fact-finding process. No such opportunity was given to the plaintiffs in this case and *Younger* is thus inapplicable.

Furthermore, even assuming *arguendo* that the OIC's investigation constitutes an ongoing judicial proceeding, the plaintiffs in this case do not ask this Court to interfere with it. That investigation has concluded and the Commissioner has rendered a decision based on the findings of that investigation. Nor is it their intention to bypass further administrative and judicial review of the Commissioner's order. Rather, what plaintiffs seek is for this Court to restrain the enforcement of that order, insofar as it purports to revoke their licenses without a pre-deprivation

hearing, while further administrative proceedings are underway. In order words, they seek protection of their rights by this Court while they pursue state remedies.

Defendants' argument also fails to establish the third criterium of *Younger*. Plaintiffs could presumably raise the constitutional challenge in proceedings before an Administrative Law Judge and surely before appellate courts. Because the plaintiffs were not given a pre-deprivation hearing, however, they did *not* have an adequate opportunity to raise the constitutional challenge before having their licenses revoked. Even assuming that defendants are correct in their definition of ongoing state proceedings, it becomes clear that if plaintiffs were not given an opportunity to be heard, they could *not* have raised any constitutional challenges. Therefore, the Court finds that plaintiffs were not given an adequate opportunity to raise the constitutional claims before the deprivation and *Younger* is inapplicable.[5]

## B. *Abstention under Burford*

Under the abstention doctrine established in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), [w]here timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial concern."

*NOPSI*, 491 U.S. at 361, 109 S.Ct. 2506 (*quoting Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). "Post-*NOPSI Burford* applies only in narrowly circumscribed situations where deference to a state's administrative processes for the determination of complex, policy-laden, state-law issues would serve a significant local interest and would render federal-court review inappropriate. Abstention will be 'the exception, not the rule.'" *Fragoso v. Lopez*, 991 F.2d 878, 882 (1st Cir.1993)(*quoting NOPSI*, 491 U.S. at 359, 109 S.Ct. 2506). "[T]he power to dismiss recognized in Burford represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)(*quoting Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236).

---

**5.** Even assuming *arguendo* that the three prongs of *Younger* are met, the Court would be inclined to deny its application because one or more of the exceptions to the doctrine are present. *See Younger* 401 U.S. at 54, 91 S.Ct. 746. First, the timing of the Commissioner's order could possibly support an inference of bad faith on the part of Contreras. The record shows that Contreras issued the order four days *after* being served with summons by the Lone Star Plaintiffs and over two years after investigators from the OIC had admitted finding no wrong-doing on plaintiffs' part. The order was also Contreras' last act before leaving the OIC and returning to private practice. A finding that the order issued in retaliation for the complaint would preclude the application of *Younger*. Second, the blatant violation of due process in the application of a statute could certainly constitute extraordinary circumstance, just short of a finding that the statute authorizing the suspension or revocation of plaintiffs' licenses without a hearing is unconstitutional.

Additionally, the Court notes that even under Puerto Rico law, a pre-deprivation hearing seems to be compelled. The Puerto Rico Administrative Procedure Act provides for pre-deprivation hearings at all agency levels with some notable exceptions and the OIC is certainly not excepted. *See* 3 P.R. Laws Ann. §§ 2102–2103, 2151–2170a

■ As with their *Younger* arguments, defendants have failed to make a convincing argument that *Burford* should apply to this case. It is not contested that the insurance industry is an area of intense local interest. *See, e.g., Allstate Insurance Company v. Sabbagh,* 603 F.2d 228, 233 (1st Cir.1979). This case, however, does not present difficult policy problems, nor does it disrupt state efforts to establish a coherent policy. First, the claims giving rise to this request for preliminary injunctive relief are of violations of federally-protected core due process rights. Although presumably the Commonwealth of Puerto Rico is also interested in respecting and guaranteeing its citizens' due process rights, this does not represent under any circumstances a complex question of state law. On the contrary, it represents a pure question of federal constitutional law. Even conceding that plaintiffs have available adequate state court remedies, they are still not barred from bringing purely federal claims in federal court. "[P]laintiffs' use or failure to use [state] remedies does not preclude their action in federal court. '[I]t is firmly settled that exhaustion or resort to state remedies is not a prerequisite to a § 1983 claim.' " *Rubin v. Smith,* 817 F.Supp. 987, 992 (D.N.H.1993)(*quoting Miller v. Hull,* 878 F.2d 523, 530 (1st Cir.1989)).

Second, the issuance of injunctive relief in this case would not interfere with the OIC's authority to regulate and establish a coherent policy in the insurance industry. This Court will not enter into the merits of the Commissioner's order, but will only enjoin the application of one of its provisions. The OIC will still retain the power to suspend and revoke insurance agent and broker licenses as it may see fit. In so doing, however, it must observe certain procedural safeguards compatible with due process.[6]

## C. *Absolute Immunity*

■ The doctrine of absolute immunity was designed "to protect judges from lawsuits claiming that their decisions had been tainted by improper motives." The doctrine will apply when a lawsuit is predicated on "acts done by judges 'in the exercise of their judicial functions.' [and] had been 'the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country.' " *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)(*quoting Bradley v. Fisher,* 80 U.S. 335, 13 Wall. 335, 347, 20 L.Ed. 646 (1871)). "If a civil action could be maintained against a judge by virtue of an allegation of malice, judges would lose 'that independence without which no judiciary can either be respectable or useful.' " *Id.* at 509, 98 S.Ct. 2894. "Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." *Id.* at 511, 98 S.Ct. 2894. Accordingly, absolute immunity has been extended to administrative officers acting in an adjudicative capacity. "[A]djudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Id.* at 512–13, 98 S.Ct. 2894. In order to be immune from suit, an administrative agency would have to be acting in the role of a neutral fact-finder and the process must "contain many of the safeguards as are available in the judicial process." *Id.* at 513, 98 S.Ct. 2894.

---

**6.** As Chief Judge Magruder stated some time ago writing for the First Circuit, "... there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of law as guaranteed by the Constitution of the United States." *Mora v. Mejias,* 206 F.2d 377, 382 (1st Cir. 1953).

In other words, the proceedings must be "adversary in nature." *Id.*

■ In this case, no such proceedings have taken place. Nor would they have taken place prior to the revocation of plaintiffs' licenses if this Court had not issued the TRO. Defendants did not preside over an adjudicative proceeding which was adversary in nature. That is to say that a hearing was not conducted before a trier of fact free from political influence, which afforded the parties with an opportunity to present their evidence orally or in writing, with the transcript and exhibits forming the exclusive basis for a decision. *See Id.* On the contrary, defendants acted unilaterally and without affording plaintiffs an opportunity to be heard. Their behavior in this case cannot by any means be compared to that expected from a judge.

■ Absolute immunity may in some instances also protect officials performing functions analogous to those of a prosecutor. "The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution." *Id.* at 515, 98 S.Ct. 2894. It is the decision to file charges, present a case before a neutral fact-finder, and seek sanctions that is protected. The Court finds, however, that the defendants' actions went beyond the scope of actions absolute immunity is meant to protect. Defendants did not stop at filing charges, but rather went on to decide the merits of the charges and unilaterally impose severe sanctions; far beyond the scope a prosecutor's functions. Therefore, the Court finds that defendants cannot hide behind the veil of absolute immunity.

### D. *Preliminary Injunctive Relief*

The First Circuit has stated that in order for this Court to issue preliminary injunctive relief, four requirement must be met: (1) plaintiffs must demonstrate a likelihood of success on the merits; (2) that a risk of irreparable injury exists if relief is not granted; (3) that plaintiffs' injury, if relief is not granted, outweighs any injury to the defendant; and (4) that the public interest will not be adversely affected by granting the injunction. *See S.E.C. v. Fife*, 311 F.3d 1, 8 (1st Cir.2002); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 47 (1st Cir.2000).

### 1. *Likelihood of success on the merits*

Plaintiffs filed this request for preliminary injunctive relief claiming violations to their due process rights. "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " *Id.* at 542, 105 S.Ct. 1487 (*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The "root requirement" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)(emphasis in original).

■ It is undisputed that plaintiffs have a property interest in their insurance licenses that activates due process concerns. Accordingly, they were entitled at a minimum to notice and an opportunity to be heard before their licenses were suspended or revoked.

> Once licenses are issued ... their constitutional possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus in-

volves state action that adjudicates important interests of the licensees. In such cases, the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

*Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). The Court heard unrebutted testimony that Lone Star would be unable to conduct its business and Urrutia would most likely lose his employment with AON if their licenses are revoked.

 Furthermore, defendants' argument that a post-deprivation hearing satisfies due process concerns lacks merit. "[E]xcept in emergency situations (and this is not one) due process requires that when a State seeks to terminate an interest such as that here involved, it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." *Id.* at 542, 91 S.Ct. 1586 (*quoting Opp Cotton Mills v. Administrator*, 312 U.S. 126, 152–6, 61 S.Ct. 524, 85 L.Ed. 624 (1941)). Defendants have not even alleged that an emergency situation exists that would warrant deprivation of plaintiffs' licenses without a hearing. "[N]o later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred." *Fuentes v. Shevin*, 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "Postdeprivation" due process "is an exception, and not the rule." *Wayfield v. Town of Tisbury*, 925 F.Supp. 880, 886 (D.Mass.1996).

 Moreover, the three factors which must be considered for a determination that plaintiffs' are entitled to a pre-deprivation hearing are present in this case, namely, (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards; and (3) the Government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). First, the private interests are plaintiffs' ability to earn a livelihood and practice their chosen professions, which would be substantially and adversely affected. Second, the manner in which the defendants decided to revoke plaintiffs' licenses did not provide any adequate safeguards or protection against an arbitrary and capricious determination. Hence, the risk at this time of an erroneous deprivation is high. Finally, the Government's interests will not be harmed by providing plaintiffs with a hearing prior to any deprivation, if it ultimately takes place. This case does not present an emergency situation where the public interest my be endangered. The alleged acts of the plaintiffs consist of the sharing of commissions and not, for example, of fraud or deceit upon the general public while conducting the business of insurance.

Defendants further argue that if plaintiffs request reconsideration of the Commissioner's orders the revocation will become a temporary suspension while a hearing is held. However, "[i]t is now well-settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes*, 407 U.S. at 84–5, 92 S.Ct. 1983. *See also Bell*, 402 U.S. at 542, 91 S.Ct. 1586.

Therefore, the Court finds that because plaintiffs were not afforded a pre-deprivation hearing as was required, they have made a showing that they are likely to succeed on the merits of their due process violation claims.

### 2. *Irreparable Injury*

"District courts have broad discretion to evaluate the irreparability of alleged harm

and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor*, 836 F.2d 566, 575–6 (D.C.Cir.1987). Harm to reputation "is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely [to] be found 'irreparable.' " *K–Mart v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989).

During the hearing, the Court heard unrebutted testimony that the insurance business is one based on trust and that the revocation of plaintiffs licenses, even if temporary, would result in unmeasurable harm to plaintiffs' reputation. The revocation of plaintiffs' licenses would prevent them from renewing any policies or issuing new ones. Thus, their existing clients and any potential new ones would have to take their business elsewhere. The damages that could result are not by any means quantifiable at his time and no amount of future monetary damages awarded on the merits of the case may in the end suitably compensate for that loss. Accordingly, an irreparable injury will result if preliminary injunctive relief is not granted.

### 3. *Balance of interests*

"The heart of the matter is 'whether the harm caused to plaintiff without the injunction, *in light of* plaintiff's likelihood of success on the merits, outweighs the harm the injunction will cause the defendant.' " *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir.1987)(*quoting Vargas–Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir.1987))(emphasis in the original). Because defendants have not shown that immediate suspension of the licenses is necessary, the Court agrees with plaintiffs that no injury will befall the defendants if the injunction is issued. The Court need not go further.

### 4. *Effect on Public Interest*

It follows from the foregoing discussion that the public interest will not be adversely affected by issuance of the injunction when contrasted with plaintiffs' deprivation of their property without due process of law. The injunction would only maintain the *status quo*. Plaintiffs would not lose license and business pending a hearing and a final decision on the merits of their request for reconsideration at the administrative level while defendants remain free to further investigate and decide whether plaintiffs may have incurred in any violation of the insurance code and regulations.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** plaintiffs' request for the entry of preliminary injunctive relief. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

That defendants Fermin M. Contreras Gomez and other responsible officials of the Office of the Insurance Commissioner, and/or their successors, agents, servants, employees, and attorneys, and those persons in active concert and participation with them, who receive actual notice of this Preliminary Injunction, by personal service or otherwise, be and are hereby,

(a) **ENJOINED** from withdrawing plaintiffs' insurance agent and broker licenses, pending the completion of a full and fair hearing and a decision on their request for reconsideration of the Commissioner's orders of December 23, 2003 in case numbers L–2003–341 and L–2003–342;

(b) **ORDERED AND COMPELLED** to maintain plaintiffs' insurance agent and broker licenses in full force and effect; and

(c) **RESTRAINED AND ENJOINED** from taking any steps to implement or enforce so much of the Commissioner's Orders of December 23, 2003 in case numbers L–2003–341 and L–2003–342 as may be inconsistent with or contrary to this Preliminary Injunction.

**IT IS SO ORDERED.**