Andres GUILLEMARD GIONORIO,
Plaintiff(s)

v.

Fermin M. CONTRERAS GOMEZ,
et al., Defendant(s)

Jorge R. Urrutia Valles,
et al., Plaintiff(s)

v.

Fermin M. Contreras Gomez,
et al., Defendant(s).

CIVIL NOS. 03–2317 (JAG),
03–2390(JAG).

United States District Court,
D. Puerto Rico.

June 4, 2004.

Joan Schlump–Peters, Nachman & Guillemard, San Juan, PR, Charles A. Cuprill–Hernandez, Charles A. Cuprill PSC, San Juan, PR, Joseph D. Steinfield, Prince, Lobel, Glovsky & Tye LLP, Boston, MA, for Plaintiffs.

Eduardo A. Vera–Ramirez, Guaynabo, PR, Ivonne Palerm–Cruz, Commonwealth Department of Justice, Federal Litigation Division, San Juan, PR, Ivette M. Berrios, Landron & Vera LLP, Guaynabo, PR, for Defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On February 19, 2004, defendants Fermin M. Contreras Gomez ("Contreras"), individually and as Insurance Commissioner of Puerto Rico, his wife Jane Doe, and the Conjugal Partnership constituted between them; and the Office of the Insurance Commissioner ("OIC"), moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint filed by plaintiffs Andres Guillemard–Gionorio ("Guillemard"), his wife Maria M. Noble–Fernandez, the Conjugal Partnership constituted between them, and Lone Star Insurance Producers, Inc. ("Lone Star")(collectively the "Lone Star

Plaintiffs"); and Jorge R. Urrutia–Valles ("Urrutia"), his wife Carolyne J. Wiewal–Navas, the Conjugal Partnership constituted between, and Urrutia Valles, Inc. ("UVI")(collectively the "UVI Plaintiffs"), alleging political discrimination pursuant to 42 U.S.C. § 1983 (Docket No. 38). On March 12, 2004, plaintiffs opposed (Docket No. 41). For the reasons discussed below, the Court **DENIES** defendants' motion to dismiss.

## FACTUAL BACKGROUND[1]

### A. *The Lone Star Plaintiffs*

In 1984, Guillemard and Noble, each of them holding an insurance agent's license issued in accordance with the Insurance Code of Puerto Rico, formed Lone Star and assigned to it their licenses. They have conducted business through Lone Star ever since, never receiving any complaints regarding their services or trustworthiness.

Lone Star first did business with a government agency in 1993, when it placed insurance for the Puerto Rico Ports Authority. In 1994, the Government of Puerto Rico determined that public authorities and government agencies should be represented by licensed insurance brokers for the purposes of obtaining insurance. Guillemard met with then Commissioner of Insurance Juan Garcia, who advised him to affiliate with an insurance broker and suggested doing so with Urrutia. Lone Star then entered into a consortium with UVI (the "consortium"), through which they successfully obtained insurance for the Puerto Rico Aqueducts and Sewer Authority, the Puerto Rico Electrical Power Agency, and the Puerto Rico Telephone Company. Lone Star and UVI shared commissions on premiums for insurance of the kind that plaintiffs were licensed to solicit. The OIC and the governmental agencies were aware at all times of the arrangement between Lone Star and UVI.

Beginning in late November 2001 and until December 17, 2001, David Castro–Anaya ("Castro"), an auditor for the OIC, reviewed Lone Star's transactions for the period between 1997 and 2001, including all documents pertaining to the insurance provided to the government agencies and the commissions shared with UVI. The Lone Star Plaintiffs gave their full cooperation to Castro, providing him with all the documents he requested and answering all his questions. Furthermore, Guillemard informed Castro that Lone Star had performed extensive work in connection with securing and servicing the government agencies' accounts, and sent him a letter detailing these efforts. On the last day of the audit, Castro informed Guillemard that he had found no irregularities and that he would send a final report in early 2002.

The consortium between Lone Star and UVI ended in 2000. Lone Star continues to serve its business and individual clients, but has not provided insurance services to any government agency since. The Lone Star Plaintiffs' licenses have been renewed twice since the 2001 audit.

In early 2003, Guillemard learned that the OIC had ordered several banks to provide financial information pertaining to Lone Star as well as all of Guillemard's and Noble's personal and business affairs. Guillemard also learned that Contreras had made disparaging remarks regarding his and Noble's political affiliation. On December 10, 2003, the Lone Star Plaintiffs filed this action. Contreras was

---

1. Because there is no dispute as to the facts leading up to the complaint, the relevant facts are taken from the Opinion and Order grant- ing preliminary injunctive relief (Docket No. 31, pp. 4–10), unless otherwise noted.

served with summons on December 19, 2003.

On December 23, 2003, Contreras, without affording them with notice or an opportunity to be heard, issued an order declaring the Lone Star Plaintiffs as nontrustworthy and incompetent. Furthermore, the order purported to revoke their insurance agent licenses for a period of five years, prevent them from applying for any other license during the same five-year period, and impose a fine in the amount of two-million thirty-five thousand dollars ($2,035,000). The order would become effective on January 7, 2004. The order also informed the Lone Star Plaintiffs of their right to request a hearing within twenty days from the order, which would stay the imposition of the fine. The revocation of their licenses, however, would remain in effect pending a hearing and a final decision. The request for a TRO and preliminary injunctive relief claiming due process violations soon followed. The Lone Star plaintiffs timely requested a hearing before the OIC, which was to be held on March 2, 2004 (Docket No. 21 at 155). Contrary to counsel for defendants' representations at the preliminary injunction hearing, however, no such hearing has been afforded them to this date (Docket No. 43).

The Lone Star Plaintiffs are active members of the New Progressive Party, and have contributed their time and given their financial support to its candidates.

B. *The UVI Plaintiffs*

Urrutia has been involved in the insurance business in Puerto Rico since June 1974 and obtained his insurance broker license on October 27, 1980. In October 1983, Urrutia organized and incorporated UVI. On January 1984, UVI obtained licenses as an insurance broker and a broker for excess lines. On July 1, 2002, UVI sold its insurance portfolio to AON B & C, Inc. UVI's licenses remained in effect until August 12, 2002. Since July 2002, Urrutia holds the position of Executive Vice–President in charge of marketing for AON Risk Services of P.R., Inc. At this time, UVI is an inactive corporation.

Between 1984 and 2002, UVI provided insurance products and services to numerous clients, establishing an excellent reputation in the process. Urrutia has been recognized as an outstanding insurance broker with an excellent reputation, and was selected as insurance broker of the year in 1985 and 1994 by Professional Insurance Agents of Puerto Rico and the Caribbean, Inc.

In 1993, following a directive from the Secretary of the Treasury of Puerto Rico requiring all government agencies to engage brokers for the purpose of acquiring insurance, UVI submitted its qualifications and was selected as one of eight firms certified to provide such services. In 1994, UVI and Lone Star entered into a consortium (the "consortium"), which was fully disclosed to the Secretary of the Treasury and the OIC. From 1994 to approximately April 2001, Urrutia, acting on behalf of the consortium, negotiated insurance policies and provided related insurance services to several government agencies and public corporations.

In May 2001, after a change in government following the 2000 general elections, then Secretary of the Treasury Juan Flores Galarza ("Flores") announced an investigation of all insurance entities which had been providing insurance services to government agencies during the previous administration. Flores specifically named UVI as a target of the investigation for alleged favoritism in the awarding of insurance business. On or about November 2001, Contreras ordered an investigation of Lone Star's and UVI's operations and

transactions from January 1997 through September 30, 2001. Specifically, the investigation targeted the consortium's transactions with government agencies and the revenues received by Lone Star as a result of those transactions. This was the first time UVI had been investigated since its inception in 1984. The investigation was conducted by Angela Rivera Soto, who received the full cooperation of the UVI Plaintiffs. The investigation ended on or about the last week of January 2002. The investigator stated that she did not find what she was looking for (Docket No. 21 at 142).

On December 23, 2003, Contreras, without affording them notice or a hearing, issued an order declaring the UVI Plaintiffs unreliable and incompetent to participate in the insurance business in Puerto Rico. Furthermore, the order purported to revoke their insurance broker licenses for a period of five years, prevent them from applying for any other license during the same five-year period, and impose a fine in the amount of two-million five-hundred sixty-seven thousand nine-hundred dollars ($2,567,900). The order would become effective on January 7, 2004. The order also informed the UVI Plaintiffs of their right to request a hearing within twenty days from the order, which would stay the imposition of the fine. The revocation of their licenses, however, would remain in effect pending a hearing and a final decision. Their complaint and request for a TRO and preliminary injunctive relief claiming due process violations soon followed. The UVI plaintiffs timely requested a hearing before the OIC, which was to be held on February 24, 2004 (Docket No. 21 at 155). Contrary to counsel for defendants' representations at the preliminary injunction hearing, however, no such hearing has been afforded them to this date (Docket No. 43).

The UVI Plaintiffs are active members of the New Progressive Party, and have contributed their time and given their financial support to its candidates.

## PROCEDURAL BACKGROUND

On February 4, 2004, the Court issued an Opinion & Order whereby it granted plaintiffs' request for preliminary injunctive relief preventing defendants from revoking their licenses pending a hearing (Docket No. 31). *See Guillemard Gionorio v. Contreras Gomez,* 301 F.Supp.2d 122 (D.P.R.2004) ("Guillemard I"). Defendants have filed an appeal from that Opinion and Order (Docket No. 33), which is still pending resolution before the First Circuit. A motion to stay the proceedings pending resolution of the appeal has been denied by this Court (Docket No. 45).

Prior to reaching the merits of the injunction request, however, the Court had to entertain arguments of abstention under the *Younger*[2] and *Burford*[3] doctrines, as well as an argument of absolute immunity. These were discussed at length and found to be inapplicable to the current controversy. Failing to grasp the concept, defendants have again raised these issues in their motion to dismiss. Accordingly, the Court refuses to repeat its discussion of these matters and denies them for the same reasons expressed in the Opinion and Order of February 4, 2004 (Docket No. 21).[4] *See Guillemard I,* 301 F.Supp.2d at 128–132. Defendants are bound by the Court's previous rulings. *See Ellis v.*

---

2. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

3. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

4. The Court will only add that, for *Younger* to apply, "the state proceedings must afford an adequate opportunity to raise the constitutional challenges." *Middlesex County Ethics Committee v. Garden State Bar Ass'n.,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116

*United States,* 313 F.3d 636, 646 (1st Cir. 2002)("court ordinarily ought to respect and follow its own rulings, made earlier in the same case.")

Furthermore, the Court refused to entertain defendants' arguments of Eleventh Amendment and qualified immunity, finding both inapplicable to the preliminary injunction setting. *See Guillemard I,* 301 F.Supp.2d at 128. Defendants again raise these defenses. The Court must, now for a third time, reject the sovereign immunity defense because it protects the OIC from damages, but not from injunctive relief, which is what plaintiffs seek here. "[S]overeign immunity shields the Government of Puerto Rico from monetary damages and does not inhibit this Court's discretion to issue injunctive relief against it's officials." *Guillemard I,* 301 F.Supp.2d at 128. "The plaintiffs in this case are seeking an injunction, not money damages. Regardless of any congressional abrogation or state waiver of immunity, federal courts have the power to enjoin state officials to conform their conduct to the requirements of federal law." *New Progressive Party v. Hernandez Colon,* 779 F.Supp. 646, 652 (D.P.R.1991)(*citing Ex parte Young,* 209 U.S. 123, 155–6, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). *See also Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir.1983).

As to the qualified immunity defense, the Court finds that, taking the facts alleged in the complaint as true, Contreras is not entitled to its protection, as will be fully discussed below.

## DISCUSSION

### A. *Motion to Dismiss Standard.*

Pursuant to Fed.R.Civ.P. Rule 12(b)(6), a complaint may not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Brown v. Hot, Sexy, and Safer Prods., Inc.,* 68 F.3d 525, 530 (1st Cir.1995). The Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990). The Court need not credit, however, "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the Complaint's allegations. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). When opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Tech.,* 950 F.2d 13, 22 (1st Cir.1991). Plaintiffs are responsible for putting their best foot forward in an effort to present a legal theory that will support their claim. *Id.* at 23 (*citing Correa–Martinez,* 903 F.2d at 52). Plaintiffs must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988).

### B. *Defendants' Motion to Dismiss*

#### 1. *Failure to state a claim for which relief can be granted*

Defendants' argue that plaintiffs' § 1983 claims should be dismissed because they fail to adequately state a claim under this circuit's heightened pleading standard for such actions. More specifically, they argue that plaintiffs must "show that the specific instances that they characterize as

---

(1982). The fact that plaintiffs have not yet been afforded a hearing, or even discovery materials, at the OIC provides the Court with

yet another reason to deny *Younger's* applicability.

a violation have a causal connection with the allegedly deprived constitutional right." (Docket No. 38 at 27)(*citing Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986)). "Plaintiffs must not only demonstrate that defendants, acting under color of law, deprived them of a federally protected right but must also prove that the named defendants were personally involved in such violation." (*Id.*)(*citing Reyes Vargas v. Rosello Gonzalez,* 135 F.Supp.2d 305, 310 (1st Cir.2001)). Reason, however, escapes them.

■ Recently, in *Educadores Puertorriquenos en Accion v. Rey Hernandez,* 367 F.3d 61 (1st Cir.2004), the First Circuit did away with the heightened pleading standard for civil rights cases; its viability as good law being questionable since the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "[T]he [Supreme] Court has signaled its disapproval of *all* heightened pleading standards except those that emanate from either congressional or Rule-based authority. Strong language in *Swierkiewicz* makes plain that federal courts should refrain from crafting heightened pleading standards, regardless of the special circumstances those standards are intended to address." *Educadores Puertorriquenos,* 367 F.3d at 66 (emphasis in the original).

> The handwriting is on the wall. *Swierkiewicz* has sounded the death knell for the imposition of a heightened pleading standard except in cases in which either a federal statute or specific Civil Rule requires that result. In all other cases, courts faced with the task of adjudicating motions to dismiss under Rule 12(b)(6) must apply the notice pleading requirements of Rule 8(a)(2).

*Id.* Accordingly, a complaint need only include "a short plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ In sum, the Lone Star Plaintiffs allege in their First Amended Complaint (Docket No. 7), first, that defendants subjected them to a retaliatory investigation and a punitive order because of their protected political speech and affiliation. And Second, that Contreras issued his order in retaliation for the filing of this action, in violation of their First Amendment right to petition the courts for redress of grievances. The UVI Plaintiffs allege in their complaint (Civ. No. 03–2390, Docket No. 1) that the defendants subjected them to a politically motivated and groundless public investigation and punitive order due to their protected political activities and affiliations. A reading of both complaints satisfies the Court that plaintiffs have more than adequately "raise[d] a plausible inference that [they] were subjected to discrimination based on [their] political affiliation or views." *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 58 (1st Cir.1990). Moreover, the Court has already implied that the timing of Contreras' order by itself could support a finding of improper retaliation following the filing of the Lone Star Plaintiffs' complaint. *See Guillemard I,* 301 F.Supp.2d at 130, n. 5. Therefore, the Court finds that plaintiffs have complied with the notice pleading requirements of Fed.R.Civ.P. 8(a)(2) and their claims survive defendants motion to dismiss.

### 2. *Declaratory Judgment*

■ From what the Court can gather from defendants' arguments, they allege that plaintiffs are not entitled to a judgment declaring that 26 P.R. Laws Ann.

§ 947, which grants the Insurance Commissioner the authority to revoke licenses, is unconstitutional. The basis for their argument seems to be that the statute sufficiently guarantees plaintiffs' due process of law. Their own actions, however, betray their words.

During the preliminary injunction hearing, defendants, through counsel, assured this Court that plaintiffs would be afforded a hearing and that they were prepared to provide any necessary discovery before the dates set for the hearings. The Court is on notice, however, that, contrary to those representations by counsel, neither the Lone Star nor the UVI plaintiffs have been afforded with a hearing or with any discovery material for that matter. In fact, it seems defendants have done everything in their power to stall any and all proceedings at the administrative level (Docket Nos. 32, 43).[5] The Court cannot comprehend how defendants can then argue that plaintiffs' due process rights can be guaranteed by the administrative process.

Furthermore, the Court has already established that due process mandates a pre-revocation hearing in this case. *See Guillemard I*, 301 F.Supp.2d at 132–133; *see also Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)("An essential principle of due process is that a deprivation of life, liberty, and property 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.' "); *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)("The 'root requirement' is 'that an individual be given an opportunity for a

hearing *before* he is deprived of any significant property interest.' "); *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)("licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."). The Court has already found that the post-deprivation hearing argued by defendants would not satisfy due process concerns and would be insufficient to adequately protect plaintiffs' property rights. *See Guillemard I*, 301 F.Supp.2d at 133. And that determination was made at a time when the Court believed that the defendants would act in good faith and afford the plaintiffs a hearing as had been represented by their counsel during the preliminary injunction proceedings. Five months have passed since Contreras' orders issued and plaintiffs have not been given an opportunity to be heard. It is only because of this Court's intervention that plaintiffs licenses remain in effect. Therefore, the Court finds defendants' argument is without merit.

### 3. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The First Circuit employs a three-part test when determining if a public official is entitled to qualified immunity: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation;

---

**5.** Although defendants represented that the UVI Plaintiffs' hearing was postponed at their own request (Docket No. 36 at 3–4), they have not denied any of plaintiffs' assertions regarding the OIC's delay in providing them with discovery materials or affording them a hearing, nor have they opposed plaintiffs' informative motion (Docket No. 43), which gives a detailed account of defendants' pattern of delay.

and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." *Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir.2004)(*citing Suboh v. District Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 90 (1st Cir.2002); *Harlow*, 457 U.S. at 818–819, 102 S.Ct. 2727).

### a. *Whether the allegations establish a constitutional violation*

▪ The Court finds that plaintiffs' allegations, if true, establish not one, but two constitutional violations. First, plaintiffs allege that Contreras and the OIC began an investigation into their business dealings because of their political affiliation to the NPP and their support of its gubernatorial candidates. If it is true that Contreras' motivation to launch an investigation into plaintiffs' business dealings was their affiliation to an opposing political party, then a violation of their First Amendment rights has been established.

Second, plaintiffs allege that Contreras' orders, which imposed multi-million dollar fines and revoked their licenses for five years, were issued in retaliation for the Lone Star Plaintiffs' filing of their complaint. If true, then Contreras' motivation for issuing the orders is a violation of plaintiffs' First Amendment rights. Furthermore, the summary revocation without a hearing of plaintiffs' licenses, had it come to fruition, would have been a violation of their due process rights. Accordingly, the first prong is met.

### b. *Whether that right was clearly established*

▪ "A right is 'clearly established' if, at the time of the alleged violation, '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Brown*, 68 F.3d at 531 (*quoting Anderson*

*v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

▪ There can be no question that plaintiffs' First Amendment rights to be free from any sort of political discrimination were clearly established both when Contreras began his investigation into plaintiffs' affairs in November of 2001 and when he issued his orders in December of 2003. *See generally Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). *See also Acevedo Garcia v. Vera–Monroig*, 213 F.Supp.2d 42, 52 (D.P.R.2002)("For the record, the prohibition against political discrimination was clearly established in 1997 when Defendants acted to violate Plaintiffs' constitutionally protected rights."); *Orraca Figueroa v. Torres Torres*, 288 F.Supp.2d 176, 187 (D.P.R.2003)("the general prohibition against political discrimination was clearly established when Defendants acted...."); *Rodriguez Vazquez v. Lopez Martinez*, 253 F.Supp.2d 164, 166 (D.P.R.2003)("the law prohibiting political discrimination was clearly established...."). *Cf. Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996)(holding that First Amendment protects independent contractors from termination or prevention of automatic renewal of at-will government contracts in retaliation for their exercise of freedom of speech); *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996)(protections generally afforded to public employees against being discharged for refusing to support political party or its candidates also extend to independent contractors); *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 40–1 (1st Cir.1992)(holding that the denial of a land use permit in unjustifiable retaliation for

the applicant's expressions of his political views is a First Amendment violation). Thus, the First Amendment claims meet the second prong.

Defendants argue that plaintiffs' due process rights, however, were not clearly established when Contreras issued his orders. The basis for their argument is that the cases of *F.D.I.C. v. Mallen*, 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), and *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997),[6] "clearly establish that pre-hearing suspensions are constitutional as long as the procedures employed to take the decision to suspend allow sufficient factual basis for taking it and the risk of an erroneous deprivation is substantially depleted." (Docket No. 38 at 44). Defendants do not, however, even attempt to illustrate which were the procedures employed to make the decision and how they work to substantially deplete the risk for an erroneous deprivation. And as the Court has found above, their actions throughout this process have demonstrated that they in fact do not intend to respect plaintiffs' rights.

Furthermore, the Court has already determined, and clear precedent dictates, that plaintiffs are entitled to a hearing before their licenses were revoked or suspended. To hold otherwise would be an exercise of blatantly ignoring over thirty years worth of Supreme and Circuit Court precedent. *See Cleveland Board of Education*, 470 U.S. at 542, 105 S.Ct. 1487 ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' "); *Fuentes v. Shevin*, 407 U.S. 67, 81–2, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented.... The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendments."); *Boddie*, 401 U.S. at 379, 91 S.Ct. 780 (The "root requirement" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."); *Bell*, 402 U.S. at 542, 91 S.Ct. 1586 ("due process requires that when a State seeks to terminate an interest such as that here involved, it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective."); *Opp Cotton Mills v. Administrator*, 312 U.S. 126, 152–3, 61 S.Ct. 524, 85 L.Ed. 624 (1941)(Due process demands "the requisite hearing is held before the final order becomes effective."); *Beauchamp v. De Abadia*, 779 F.2d 773, 775 (1st Cir.1985)("The district court's holding that [plaintiff] had a right to a hearing before his [medical] license could be revoked was correct.").

It is only in emergency situations, and defendants have been unable to show that this is one, that a post-deprivation hearing may satisfy due process concerns. *See Bell*, 402 U.S. at 542, 91 S.Ct. 1586 (Except in emergency situations, State must afford notice and opportunity for hearing appropriate to the nature of the case before termination becomes effective.); *Fuentes*, 407 U.S. at 82, 92 S.Ct. 1983 ("no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred."); *Wayfield v.*

---

6. *Mallen* and *Homar* are inapplicable to this case and create no controversy as to the state of law at the time of the alleged violation. There, an independent third party had found probable cause to believe the plaintiffs had committed a serious crime before the challenged action occurred. No such independent determination is present here. The only determination as to any wrongdoing on the part of plaintiffs was made by Contreras.

*Town of Tisbury,* 925 F.Supp. 880, 886 (D.Mass.1996)("Postdeprivation" due process "is an exception, and not the rule"). The Court need not go further.

c. *Whether a reasonable official would have understood that the challenged action violated the constitutional right at issue*

"[T]he relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *Singer v. Maine,* 49 F.3d 837, 844 (1st Cir.1995) (citations omitted).

██ Defendants argue that, in making this determination, the Court must consider that plaintiffs' affairs had been under investigation for two years, thus, allowing Contreras to determine that the plaintiffs had incurred in serious violations that would justify a suspension without a hearing. They do not, however, even attempt to delineate what constituted such serious violations as to warrant emergency action.[7] Plaintiffs' allegedly serious violations occurred over three years before the orders issued, thus negating any grounds for arguing that immediate action was necessary. There is also unrebutted testimony on the record that the OIC's investigation into plaintiffs' affairs yielded no evidence of wrongdoing. (*See, e.g.,* Docket No. 21 at 142). Therefore, if the Court were to take into consideration the OIC's investigation, it would actually hurt the defendants more that it would help them.

In relation to the First Amendment claims, defendants do not even try to argue that it was reasonable for them to believe their actions would not violate plaintiffs' rights. In any event, Contreras'

motivation for ordering the investigation and for issuing the orders, although sufficiently alleged so that it survives defendants' motion to dismiss, has not been established through a proffer of evidence that would allow the Court to make a definitive ruling at this time. In other words, there are issues of material fact which preclude the granting of qualified immunity to Contreras at this time. Defendants' may, upon the conclusion of discovery, resubmit the question at the summary judgment or trial stage.

In relation to the due process claims, defendants only hint at an argument that the Insurance Code allowed Contreras to revoke plaintiffs' licenses without a previous hearing. Their contention is, however, without merit.

First, the Court has already implied that 26 P.R. Laws Ann. § 947 suffers from a constitutional infirmity insofar as it authorizes the suspension or revocation of plaintiffs' licenses without a hearing. *See Guillemard I,* 301 F.Supp.2d at 130, n. 5. Second, with all the precedent cited above, the Court is hard pressed to understand how Contreras, who is a practicing attorney, could reasonably have believed that his orders would not violate plaintiffs' due process rights. The notion is untenable.

Moreover,

[a] statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws. Nor can a law enforcement officer [or public official] be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional.

*Illinois v. Krull,* 480 U.S. 340, 355, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). On this

---

7. The Court notes that even Contreras' orders

themselves obviate this information.

question the Court can confidently state that, absent exigent circumstances, no reasonable official could have believed that revoking plaintiffs' licenses without a prior hearing, even if allowed by state law, would not violate their constitutionally guaranteed due process rights. Therefore, Qualified immunity must also be denied to Contreras on plaintiffs' due process claims.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** defendants' motion to dismiss.

IT IS SO ORDERED.